UNITED STATES of America,
Plaintiff,
Luther McKinstry, et al., Plaintiffs;
William Hardy, et al., Plaintiffs;
John S. Ford, et al., Plaintiffs;
Elder Brown, et al., Plaintiffs;
Elex P. Love, et al., Plaintiffs;
Thomas Johnson, et al., Plaintiffs;
James Donald, et al., Plaintiffs;
James Fillingame, Plaintiff;
v.
UNITED STATES STEEL CORPORA-
TION et al., Defendants.*
Civ. A. Nos. 70–906, 66–343, 66–423, 66–
625, 67–121, 68–204, 69–68, 69–165
and 71–131.

United States District Court,
N. D. Alabama, S. D.
Dec. 11, 1973.

* Consolidated with: McKinstry v. United States Steel Corp., 66–343; Hardy, 66–423; Ford, 66–625; Brown, 67–121; Love, 68– 204; Johnson, 69–68; Donald, 69–165; Fillingame, 71–131.

John N. Mitchell, Atty. Gen., Jerris Leonard, Asst. Atty. Gen., Wayman G. Sherrer, U. S. Atty., Robert T. Moore, Deputy Chief, Employment Sec. Dept. of Justice, Washington, D. C., for plaintiff (Oscar W. Adams, Jr., Birmingham, Ala., designated as liaison counsel for plaintiffs in related cases).

John C. Bird, Gen. Atty., Southern Area, U. S. Steel Corp., and William K. Murray, Thomas, Taliferro, Forman, Burr & Murray, J. R. Forman, Jr., Birmingham, Ala., for U. S. Steel Corp.

Jerome A. Cooper, Cooper, Mitch & Crawford for USW.

## MEMORANDUM OF OPINION

POINTER, District Judge.

Consolidated trial of these Title VII cases[1] began in June, 1972. In December, 1972—after hundreds of witnesses, more than 10,000 pages of testimony, and over ten feet of stipulations and exhibits (the bulk being in computer or summary form)—the parties rested, subject to the submission of certain supplemental computer studies and analysis. Trial would have been even more prolonged but for the severance of one major issue (test validation) and for the very professional attitude of all counsel in expediting trial.[2] A decree of over

1. The Fillingame suit, CA 71–131, brought by a white employee, is essentially a charge of unfair representation against the union. The other private suits, brought by black employees, make claims under 42 U.S.C.A § 1981 as well as under Title VII.

2. For example, on one day the court was able to hear over 60 witnesses relative to a narrow dispute of fact. Rarely was the court called upon to rule on matters of authenticity of documents.

150 pages was entered May 2, 1973, covering most issues; and on August 10, 1973, a final judgment was entered covering all remaining issues except that of test validation. This preface is given to explain why the court in this opinion has chosen not to deal with each aspect and issue but rather to focus on matters related to the few questions as to which appeal has been taken.[3]

## OVERVIEW OF OPERATIONS AND ORGANIZATION

"Fairfield Works", one of the largest units of United States Steel Corporation, consists of nine plants in Jefferson County, Alabama. Two (Ore Conditioning; Coke & Coal Chemicals) process raw materials. Two (Ensley; Fairfield) are basic steel producing facilities, with some finished products. Four (Tin; Wire; Sheet; Bessemer Rolling) make finished products. The ninth[4] (Rail Transportation) provides rail transportation services for the other eight.

The plants came into being at different times, and some were initially under different ownerships. Ensley, the oldest part of the works, was started in 1886, while Ore Conditioning, the most recent, was constructed in 1939–40. The nine plants now form a single interrelated steel producing operation, with operational responsibility vested in a General Superintendent. His principal managerial assistants, called Division Superintendents, have functional responsibilities which may include operations at more than one plant.

Similarly, union organization—and subsequent management recognition—occurred at different plants at varying times during the late 30's and early 40's. Two locals of the Steelworkers represent production and maintenance (P & M) employees of the Rail Transportation plant; a separate Steelworkers local represents P & M employees at each of the other eight plants. A separate Steelworkers local represents plant protection employees throughout the works, and another represents the unionized clerical and technical (C & T) employees works-wide.[5]

In recent years the basic principles for employment of P & M employees have been established in triennial industry-wide negotiations leading to, e. g., the 1965 Basic Steel P & M Agreement. These principles have, however, since 1953 been modified on a local basis through the adoption of "local seniority rules and regulations", in which the various locals have asserted their independence in collective bargaining. The consequence is that, though the basic principles are similar, there are ten separate arrangements governing seniority for P & M employees at Fairfield Works, as well as a separate arrangement for plant protection workers and one for the unionized C & T employees. It should be noted that employees holding trade and craft (T & C) positions in a plant are part of the same local which represents non-T & C employees at that plant and are subject to the same collective bargaining agreement, though with some special provisions for T & C jobs.

In the steel industry in general, and at Fairfield Works in particular, there are significant fluctuations in operational requirements and, hence, in manpower

---

3. The court has been advised that the appeals are limited to back pay and earnings retention ("red circle") issues. While this opinion is filed subsequent to entry of judgment the essential findings and conclusions were communicated to the parties prior to the judgment in a series of informal conferences.

4. The term "plant" is a misnomer for Rail Transportation but is nevertheless used in this opinion for convenience.

5. The United Steelworkers of America, AFL–CIO–CLC, and the twelve Steelworkers locals constitute, along with the company, the defendants in this litigation. Three other unions, not named as defendants, have represented a limited number of employees in specialized operations.

levels. Some jobs may be worked on a three-shift-a-day, seven-day-a-week basis ("21-turns"), and then at other times worked one-shift-a-day, five-days-a-week by a single man or crew ("5-turns"), or even completely halted, with a variety of intermediate manning levels. Within a given plant one operation may be on a 21-turn basis and another, during the same period, on a 5-turn basis. This fluctuation constitutes a major factor in the study of the "system" at the works and, in turn, is dealt with at length in the collective bargaining rules.

■ On a relatively busy day one would expect to find some 12,000 persons on the job [6] at Fairfield Works, of which some 27% would be black employees.[7] P & M employees constitute the bulk of the work force—typically some 3,100 blacks and 6,000 whites— and, accordingly, it is not surprising that this litigation has tended to focus principally on employment practices and conditions concerning P & M employees.

There are over a thousand P & M positions, most of which are filled by more than one employee on a given day. These positions have a technical name generally descriptive of their principal function, e. g., "Rail Straightener Helper", and frequently have a shop name, e. g., "Gagger". Each position has a prescribed job class level, e. g., "JC 4", which determines the relative wage scale for that job in comparison with other jobs.[8] Most, but not all, positions have production-oriented incentive pay arrangements, either direct or indirect, some by individual performance and others by crew or group productivity. The differences between these negotiated incentive plans may be quite significant: for example, a JC 2 position with a "good" incentive plan may be more attractive financially than one rated JC 6 with a "poor" plan. Of course, the earnings of any individual P & M employee are also dependent upon how many hours are worked and when (e. g., overtime, shift premiums, and Sunday and holiday premiums).

## SENIORITY SYSTEM

Within each plant the higher paying jobs—virtually all in JC 5 or above, and some in JC 4—are grouped for promotional and retention purposes in ladderlike sequences called lines of progression or promotion (LOP).[9] The groupings

6. There would be several thousand additional employees either sick, on vacation or leave, or on lay-off.

7. The record of the company in hiring blacks over the years is sufficiently good that in none of the suits is there a general claim of discrimination in hiring. There is a claim of discrimination as to hiring for certain types of jobs (e. g., supervisory) and as to initial assignment of blacks disproportionately to less desirable plants. On this latter claim the court finds from the evidence no such discrimination since July 1965; and on the first claim the court has included in the decree provisions to mandate judicially parts of the company's "Affirmative Action Compliance Program."

8. The job class levels, which range from a low of JC 1 to a high of JC 30, were established in the late 40's and early 50's as an outgrowth of a wage inequity study program initiated under the auspices of the War Production Board and conducted on an industry-wide basis. The levels were established after a consideration of a number of factors inherent in the jobs as performed at the time of the study, e. g., physical effort, mental effort, skills, responsibility, working conditions, et cetera. The industry—companies and unions—has agreed not to reevaluate these ratings except where the factors have changed since the time of the study. At triennial bargaining sessions the actual hourly rate for each job class level is determined by negotiation; e. g., under the 1971 agreement the hourly rates start with $3.385 for JC 1 and rise to $5.905 for JC 30. While agreeing not to reevaluate JC determinations for particular jobs absent a change in the job content, the parties have occasionally negotiated "differentials" for "out-of-line" or special situations (e. g., trade and craft).

9. Composition of the several hundred LOPs in Fairfield Works varies widely. Many have but one job (which eliminates the promotional aspect of the LOP concept). Some are long lines, with the bottom job(s) being JC 4 and, after many intervening occupations, a top job as high as JC 30. Some LOPs have a top job below JC 10; others have their bottom job above JC 10. Some have multi-manned jobs, a number of em-

generally, but not always, are composed of occupations which work together on some process (e. g., feeding and operating a rolling machine) or which perform similar functions (e. g., maintaining production or inventory records). For the most part the upward sequence is from the lowest JC occupation in the line to the highest; but, here again, there are numerous instances in which a higher job in the LOP may, whether by reason of its JC level, incentive plan, or otherwise, be a lower paying job in practice than one or more of those below it.

When a vacancy arises in a job in an LOP, those persons on the immediately preceding rung of the ladder are entitled to first consideration. If one of these persons is selected, this may create a vacancy on that step of the ladder, which in turn is filled by promotion of a person on the next preceding rung, etc. If this process ultimately produces a vacancy on the bottom step of the ladder, it is filled by bringing a new employee into the LOP.

The selection of which of several employees on the same step of the LOP is to be promoted is essentially [10] a question of which is the "oldest" employee. At this point a generalization as to works-wide practice can no longer be made; for under some local plant rules the oldest employee is the one who has been on the preceding job longest (occupational seniority), while in others it is the employee with longest service in the

LOP (LOP seniority), in the department (departmental seniority), or in the plant (plant seniority).

In most plants the method for determining age for promotional purposes is also used to determine age for the purpose of job entitlement on reductions and increases in manpower levels. The younger or junior employee so determined, is, in a work reduction, "rolled back" to the next lower job or jobs in the LOP until his age is sufficient to allow him to "hold", thereby displacing at that point a junior employee who then in like manner rolls back into lower jobs or into the pool. The process is, in essence, reversed on an increase in manpower levels. There are various special rules, not identical for all plants nor necessarily uniform within the same place, to cover particular situations; such as where a younger employee is for some reason holding a higher job in the LOP, or where an employee prefers "going to the street" and taking supplemental unemployment benefits (SUB), or where an LOP contains lower jobs that, due to prior mergers of lines or otherwise, the employee has not previously worked. There are special rules covering temporary assignments and delineating between those vacancies considered permanent and those deemed temporary.

The lower rated jobs, except in the Ore Conditioning Plant, are grouped into pools, which generally correspond to geographical divisions or departments in the plant.[11] These offer no promotional opportunities as such;[12] rather they are

---

ployees working the same job at the same time; others have but one employee filling each level of the ladder. Most LOPs are ladder-like; but some have one or more branches, which may or may not reunite. Some treat several jobs as being on the same level or even as the same step of the ladder; others treat each job as a new step even if there is no change in earnings.

10. Under the contracts age is the determining factor only where ability to perform the work and relative fitness of the competing employees are relatively equal. In practice most vacancies are filled in accordance with the age factor.

11. The basic concept of the pools, which were established in 1962–63, is not challenged by the United States or the private plaintiffs. The pools provide better protection against layoff than existed prior to their creation, utilizing plant age to determine entitlement to a pool job. In a sense the pool jobs represent a bottom job for all lines of promotion.

12. There is a limited form of promotional opportunity within a pool. The Company and local union have classified the jobs in each area pool according to their relative desirability (from the standpoint of earnings, exertion and working conditions). The em-

essentially "waiting" jobs—more menial jobs to which employees are assigned while they wait to get into, or return to, an LOP job. Assignment of pool employees to temporary vacancies in LOPs is left to the discretion of management, the evidence indicating that the principles employed in making such assignments vary from one supervisor to the next.

■ Permanent vacancies in an LOP which are not filled by employees already in that LOP [13] are filled by a bidding system specified in the collective bargaining agreements: the vacancy is "posted"; interested employees, whether in the pool or from other LOPs, can bid on the vacancy; the company is then required, assuming relatively equal abilities and fitness, to select that bidding employee with the most plant service where the job is located. A grievance and arbitration procedure is spelled out in the contracts; and the evidence demonstrates that the unions have, in promotional disputes as well as in other matters, fairly pursued such remedies for the employees without regard to their race or color.[14]

A significant degree of choice is reserved to the individual employee. He [15] may decline to bid from the pool or another LOP on a posted vacancy in an LOP to which, based on plant age, he presumably would be entitled. He may decline to take a permanent promotion from a job in an LOP to a higher job in that line. He is usually allowed to decline to accept a temporary assignment, whether that be a step-up in his own LOP or an opportunity given a pool employee to work on an LOP job. He may, after having declined such opportunities or assignments in one or more occasions, change his mind when the situation is next again presented.

Each LOP is, in essence, separate from all other LOPs, without transfer rights except through the bid procedure,[16] which generally means starting at the bottom of the ladder and, under the occupational and LOP age systems, as a "new" man. In practical effect this means that an employee's promotional history, at least in retrospect, is to a significant degree preordained by the LOP which, through the voluntary bid system, he successfully chooses to enter. At the time of making his choice

ployees on pool jobs having the longest service in the area which the pool covers are entitled to a job with Job Desirability Level 1 (most desirable), those with the next longest such service to JDL 2 jobs, and those with the least such service to JDL 3 jobs. The selection of which job in the applicable JDL an employee is assigned has been left to management's discretion.

13. Those with recall rights to the LOP are first offered the position before it is bid. It may be noted that, while most frequently it is the bottom job in the LOP that is posted, on occasions (for example, when employees lower in the line decline the promotion or when there is a large upturn in the level of operations) some intermediate job or jobs in an LOP may also be filled by the bid procedure.

14. This is particularly significant in matters such as promotional disputes because the union will generally find itself urging a position that, at the same time, is adverse to the best immediate financial interest of another of its members. In making this finding and

conclusion, the court is not expressing agreement with the result of each grievance about which some evidence was presented at trial, nor is the court saying that in each such dispute was any racial discrimination corrected. Rather, the court is saying that in the handling of grievances there has been no racial discrimination as a systemic matter, allowing for the possibility of some isolated aberrations.

15. The masculine gender is used throughout this opinion for convenience. It should be noted however that the company has a number of female employees, including many in P & M jobs. This litigation does not involve any charges of sex discrimination, nor does the court imply that there is any evidence of such discrimination. However, in framing its decree, the court has attempted to avoid any provisions that would result in such discrimination or tend to perpetuate the effects of past discrimination, if any, based on sex.

16. As an exception, the company and union in the Sheet plant have provided a link between units 123A and 125A.

of LOPs he can do little more than guess as to his future.[17] An LOP which at the time appears to be most promising may, due to differences in the health or circumstances of other employees, in technological advances, in the demand and competitive situation for particular products, et cetera, provide in fact fewer opportunities than LOPs which he chose to turn down. Even within an LOP he may find himself confronted with a similar dilemma when the line divides into separate branches. The point of the foregoing is not to condemn as such the seniority system, but rather to emphasize that *choice* and *chance* play a vital role in the system—and are, indeed themselves major elements of the system which this court is called upon to evaluate under the provisions of Title VII and 42 U.S.C. § 1981.

## PERSPECTIVE

In this litigation the court is looking not at a still photograph, but rather at a motion picture, one which pans across nine plants in Jefferson County, Alabama, and occasionally picks up activities in Pittsburgh or on a college campus. It commences many years before passage of the 1964 Civil Rights Act. Nor has it ended with the institution of these suits; indeed, it continued to run during the five months of trial such that a frame of July 1972 had undergone changes when compared with one in December of that year. In like manner, the court is asked to fashion remedies by estimating what this motion picture can depict in the months and years ahead.

With over 10,000 employees, the number of interactions between employees and of possibilities for employment dis-

putes becomes, over a period of years, rather astronomical. Given the racial composition of the work force, it is not surprising that a very large number of disputes would be considered by one or more of the participants as having racial implications. Indeed, it is understandable that black employees, having experienced various forms of direct and indirect racial discrimination in other areas of life, would frequently perceive any disappointments in employment matters from a like perspective. To accept this as so does not mean, of course, that their perceptions are either always correct or never correct.

The court's attention in this litigation[18] is directed however not to individual complaints as such, but to charges of discriminatory procedures, policies, and continuing practices. The focus is upon a system, not upon the isolated aberrations therefrom as such. The system, of course, involves not merely a study of rules and procedures, whether express or implied, but also a consideration of how these work in application. There is evidence, for example, that George Davis, a black millwright, may have the wrong seniority date. The applicable rule has been that his "age" is to be computed from the time he became a millwright helper, and he says that he became a helper earlier than the date shown for him on the seniority lists. While not called upon to determine the merits of each such complaint, the court can, however, conclude from the evidence concerning Davis and others that (1) one of the attributes of the system is that it is not perfect—the possibility of error is indeed a part of the system; (2) the system provides mechanisms for the correction of errors (*e. g.*, the grievance procedure and

17. For example, in 1968 Oscar Beaton was the successful bidder in two separate LOPs. His choice (contrary to his foreman's advice) has resulted in a $1,200.00 loss (comparing his earnings to those of the employee who advanced to the other job on his declination) in a three year period, and quite likely will result in further losses in the years ahead.

18. Of course, an action can be brought respecting a single, isolated act of discrimination under 42 U.S.C.A. § 2000e–2. But each of the private plaintiff cases here involved has a broader scope. It is doubtful that the court could have physically managed the litigation if each possible claim of individual discrimination had been pressed through the vehicle of these cases.

collective bargaining); and (3) the corrective mechanisms are themselves imperfect.

■ The focus of this litigation is whether this imperfect system, with its imperfect correcting mechanisms, meets the standards imposed by law and, to the extent it does not, how such should be corrected. So, we are concerned about the "age" of George Davis not to correct an error in his seniority date, but rather to evaluate the system and its elements. If the number of like incidents is sufficiently high, we may take this to be characteristic of the system and, if it tends to affect blacks to a greater degree than whites, we are called upon to view the system in this respect as racially discriminatory and provide rectification.

Seniority questions in a real sense are not matters of the company or the union "doing something" to somebody else, but rather disputes between two employees or groups of employees in which a major objective of company and union is to survive unscathed. Yet the perspective of the plaintiffs (as well as white employees) frequently is that "they"— meaning the company or union or both —did something or failed to do something. But the plaintiffs and the other employees are in many respects part of the "they", whether as employees of a corporation which can only act through its agents, or as members of a union which likewise is ultimately dependent upon the actions of its members.[19]

■ It is easy enough to hold that policies established by the work's General Superintendent are those "of the company". At lower echelons the answer is more difficult. For example, the racial prejudice of a turn foreman translated into action by the unfair assignments of temporary work, or of some skilled white workman in refusing to give training to a black employee, is discrimination. But when such actions are contrary to established policy of the company, a policy which upper management attempts to enforce within means reasonably available, these should not, it seems, be taken as company action,[20] that is, insofar as representing any policy or procedure of the company.

■ When is a procedure racially discriminatory? Only when the impact falls solely on black employees? Only when the beneficiaries of the practice are solely white employees? If affirmative answers were to be given, very few, if any, of the plaintiffs' claims could be sustained. This court concludes, to the contrary, that a practice or procedure which has mixed racial effects may nevertheless be presumptively violative of Title VII where the benefits or detriments therefrom bear a significant correlation to race. It should be noted that efforts to correct such situations can likewise be expected to produce benefits and detriments which do not completely follow racial lines.

Finally, this court must continue to remind itself that the principles governing this industrial community were not divined in the sanctuary of a theoretician's office, but rather to a large extent were evolved through trial and error over a long span of time by people having to live with the consequences.[21] So then, the court should be wary of adopting a cavalier attitude towards unneces-

---

19. In this connection it is not without significance that the unions at the Wire plant and Bessemer Rolling Plant are dominated by black members.

20. A distinction can be drawn between an unintended or accidental act and an intended act which, though without bad motives, produces a proscribed result. *Cf.* Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and Rowe v. GM Corp., 457 F.2d 348 (CA5 1972). This is not, of course, to rule that an individual claim under Title VII cannot be predicated on an action by a foreman in the scope of his employment.

21. Note also that the older practices, developed when there was direct segregation of most P & M jobs, were not themselves racially motivated—they rather were dealing with relative seniority between employees of the same race.

sary alterations in the basic fiber and structure of this community, while at the same time keeping in mind that the "business necessity" doctrine means just what the words denote and that these long-standing rules "do not, *per se*, carry the authoritative imprimatur and moral force of sacred scripture, or even of mundane legislation." United States v. Jacksonville Terminal Co., 451 F.2d 418, 454 (CA5 1971).

## DISCRIMINATION

The foundation for this litigation rests upon the undisputed fact that at Fairfield Works a policy of segregation was generally followed until the past decade. Most LOPs were segregated, with the black-only and few racially-mixed lines containing, not surprisingly, most of the less desirable jobs and none of the highest paying ones. There were few black employees in T&C positions, and none in clerical and technical jobs, plant protection occupations, or managerial and supervisory positions.

In the early 60's, however, largely in response to Executive Order 10925 and Whitfield v. United Steelworkers, 263 F.2d 546 (CA5 1959), non-discrimination became the announced official policy at the works. By 1963, the company and unions had established the system, previously described, for pooling the lowest paying jobs and for open bidding into the LOPs. They also had begun a program for merging LOPs, a program under which, ultimately, a majority of the formerly all-black and racially-mixed lines were merged into formerly all-white ones.[22]

The formal opening of the door did not, of course, constitute an immediate panacea for all blacks whose employment opportunities had been so long restricted. A number of contributing factors can be identified as explanation of why the change in announced policy was somewhat less than what it was advertised, and perhaps expected, to accomplish: the actual loss of seniority on changing LOPs . . . the fact that entry-level LOP jobs sometimes involve a reduction in overall-earnings . . . the belief, due in large part to confusion over the rules, that there were other disadvantages to bidding into a new line . . . the rejection of some black bidders through application of the ability and fitness standards . . . the skepticism and suspicion by many blacks as to the reality of new opportunities . . . the disapproval and resistance expressed by many white employees to such changes . . . the unwillingness, particularly among older black employees, to leave familiar conditions, to assume greater responsibilities, or to be considered troublemakers . . . the inability, again particularly among the older employees, to learn new skills . . . etc. Furthermore, enjoyment of these new opportunities was directly dependent upon vacancies coming open; and the overall manpower levels at Fairfield Works have generally been on the decline during the past decade.

The point is that, while the 1962–63 changes represented a truly radical alteration in the employment practices at Fairfield,[23] some passage of time was needed for these processes to begin transforming the statistical profile, at least as viewed by an outside observer.

It is clear that on July 2, 1965, the effective date of Title VII, the basic prin-

---

22. Mergers were generally accomplished by tacking formerly black or mixed jobs to the bottom of existing white lines. This, however, was understandable because such jobs, as noted, were typically the lower-paying less-skilled ones. It is in the placing of intermediate jobs, in the establishment of 1A–1B (see *infra*) lines, and in the failure or delay in merging lines that active (as distinguished from passive perpetuating) discrimination can be seen.

23. These changes pre-dated most of the dramatic changes in education, housing, public accommodations, etc. Responsible leaders for the company and unions were, according to the evidence, subjected to threatening and abusive communications, vilification generally in the community, and hanging in effigy. Ten years later, when the battle-cry has changed such that it typically begins, "We're not fighting integration, but . . . ," there is a tendency to block out the memory of what was said and done in the early 60's.

ciples of the seniority system in effect at Fairfield were not "actively" discriminatory.[24] It is likewise clear that in many respects this system, in violation of Title VII, has perpetuated the effects of the pre-1963 discrimination. Local 189 v. United States, 416 F.2d 980 (CA5 1969).

The sequential arrangement of jobs in a line of promotion has a tendency, by its very nature, to prolong the effects of a prior restriction of blacks to lower jobs, as does the judicial impediment to "bumping" incumbents. However, when supplemented by a standard that uses occupational or LOP age to measure promotions or retention priority, the secondary position of blacks becomes fixed —initially behind, they will remain behind their white contemporaries in progressing up the ladder towards better jobs. Use of LOP age produces similar results where, as here, the past discrimination involved segregated lines; and even departmental age has like consequences where, as here, black employees were not assigned, in the past, proportionately among all departments.

## INJUNCTIVE RELIEF

■■ The principal remedial step directed by the court to alleviate this situation has been to mandate the use of plant age in measuring seniority for promotion,[25] retention, and recall purposes.[26] Also, the court directed forty-one additional mergers of LOPs, primarily to increase promotional opportunities. In a large number of LOPs other changes were directed, as by transferring one or more occupations from one line to another, or by altering the relative position of some jobs (to correct the typical placement of formerly black jobs below comparable white jobs), or by "boxing", "blocking", or connecting jobs in a line in such a way as to provide the equivalent of job skipping where not contrary to business necessity shown by the evidence.[27] The 1A–1B concept was ordered abolished.[28]

■ To increase the number of occasions in which these new rights may be exercised in conformity with the principles enunciated in Local 189 v. United States, *supra*, the court has directed that opportunities for promotion be afforded not only in the event of the death, retirement or promotion of other employees, but also with appropriate

24. Plaintiffs do not really seek to posit a cause of action under 42 U.S.C.A. § 1981 on pre-1963 acts in view of the statute of limitations question. See Buckner v. Goodyear Tire, 339 F.Supp. 1108 (N.D.Ala.1972), aff'd, 476 F.2d 1287 (CA5 1973).

25. For promotional purposes there is a year's waiting period before plant age may be used by a new entrant into an LOP. This is to insure a minimum period for training and experience before rising to more responsible positions in the line. As shown by the evidence, a failure to require such a period not only would create a significant hazard to personnel and equipment, but also would have substantial adverse effect under the production-oriented incentive plans on the compensation of other employees, including members of the plaintiff class. By other provisions of the decree the pre-1963 black employees choosing to enter a new LOP are, however, granted earnings protection in their new line during this waiting period.

26. Use of plant age, or even company age, would not necessarily be an appropriate remedy if the company had been guilty in the past of racial discrimination in hiring. There is no evidence in this case of any such discrimination regarding P & M jobs.

27. The court does find and conclude from the evidence that business necessity has been shown and established for the basic principal involved in the line of promotion concept and that, in the particulars where not so shown, the same could be corrected without discarding the principle itself.

28. Many "mergers" of lines were effected by tacking a formerly black line near the bottom of a white LOP, but as a separate root or branch. The top jobs in such a 1B branch were to have, on paper if not always in practice, a priority to entry-level vacancies in the 1A branch, though without any credit for time spent in 1B jobs. In many of these situations this concept was coupled with the incorporation of "Rule VII–A–1–a", which, at least on paper, gave whites up in

safeguards [29] in recall situations following force reductions of at least fifteen days. For like reason, the court has, in view of the very limited promotional opportunities potentially available in the Bessemer Rolling Mill and in the Maintenance of Way Department of the Rail Transportation Division, directed that such LOPs be realigned as departments in the Fairfield Steel plant, with a carry-forward of their former plant age for use in bidding on jobs in other LOPs in their new plant.

■ Temporary assignments of pool employees to LOP jobs are significant both in terms of increased interim earnings and in view of the training afforded thereby. To assure fair treatment, the court has directed the company to utilize plant age in determining the pool employee to fill a temporary vacancy in an LOP in the area served by that pool.

■ Across-the-board, uniform, color-blind modifications in the seniority rules, such as summarized in the three preceding paragraphs, do not in every particular erase the continuing effect of past discrimination. Accordingly, special remedies—as by requiring training and testing for certain craftsman occupations and by judicially mandating portions of the "Affirmative Action Compliance Program" promulgated by the company—have been incorporated in the court's decree to rectify the impact of past discrimination in T & C positions, C & T occupations, and supervisory jobs. A significant feature of these provisions is that, while the company is not required to appoint an unqualified person to such positions, yet it may not reject as unqualified a black applicant who possesses qualifications equal to those which were possessed by any white applicant for the same or like position who in the past was selected and who has performed successfully in such position.

To minimize unnecessary confusion and turmoil and to assure accurate dissemination and understanding of the court's decree of May 2, 1973, two complementary provisions were included in the order. First, a ninety-day delay was provided for most of the substantive changes in the seniority system.[30] Secondly, and equally important, the court established an on-the-site three-member Implementation Committee, consisting of a knowledgeable representative of the company, of the unions, and of plaintiff class. In addition to acting as a communications link, the Implementation Committee is available to monitor the grievance procedures for possible deviation from the principles established by the court decree and has assisted in the preparation of plans for upgrading to journeyman status certain black employees in conformity with the court's decree.

## BACK PAY AND FUTURE PAY

■ Back pay is properly viewed as an *integral* part of the whole of relief, which seeks not to punish the defendant,[31] but to compensate the victim of discrimination. United States v. Georgia Power Co., 474 F.2d 906 (CA5 1973). *Cf.* Moody v. Albemarle Paper

the 1A line the right to roll back into 1B jobs on reductions in force.

**29.** A few jobs—those in which a high degree of skill is required on the most responsible jobs in a given operation—have been designated as "critical" jobs and excluded from those in which periodic reshuffles may occur as a consequence of increases and decreases in the work force. This protection, deemed essential if reshuffling is to be allowed on other jobs, is limited to the manning levels during normal operational levels.

**30.** The dissemination process was accomplished more rapidly and with fewer problems than had been anticipated; and, accordingly, many of the changes were, by agreement of the parties and with the court's approval, put into effect prior to the August 1, 1973, deadline.

**31.** But see United States v. N. L. Industries, 479 F.2d 354, (CA8 1973) in which the court indicated that the deterrent effect of backpay awards, spurring other employers and unions to initiate corrective measures, is more important than the compensatory role. This comment sounds much like punitive damages.

Co., 474 F.2d 134 (CA4 1973) (in view of strong congressional policy successful plaintiffs should ordinarily be awarded back pay unless special circumstances would render the award unjust).

This policy, however, is one that guides the court in its exercise of equitable discretion.[32] Monetary awards must nevertheless be made only for actual damage. Lea v. Cone Mills Corp., 438 F.2d 86 (CA4 1971); Moody v. Albemarle Paper Co., 474 F.2d 134 (CA4 1973). While equity may for purposes of injunctive relief presume damages from the invasion of a legal right, United States v. Hayes Intern'l Corp., 415 F.2d 1038 (CA5 1969),[33] traditionally the courts have required, as a prerequisite to compensatory monetary awards, both proof that the claimant has actually sustained a loss from the defendant's improper conduct and evidence from which the amount of such damage can be determined with a reasonable degree of accuracy. See United States v. Huff, 175 F.2d 678 (CA5 1949); Blake v. Robertson, 94 U.S. 728, 24 L.Ed. 245 (1877); Philp v. Nock, 17 Wall. 460, 84 U.S. 460, 21 L.Ed. 679 (1873). The question becomes what evidence is sufficient for these purposes and, of necessity, what party has the burden of proof with respect thereto.

"Statistics often tell much, and Courts listen." Bing v. Roadway Express, Inc., 444 F.2d 687 (CA5 1971). An argument can be made on the basis of the opinions in Cooper v. Allen, 467 F.2d 836 (CA5 1972) and Hodgson v. First Federal Savings & Loan Ass'n, 455 F.2d 818 (CA5 1972), that evidence, such as statistical data, which would suffice to shift the burden of proof [34] to the defendant respecting the alleged discrimination by the employer, would likewise shift such burden to the defendant respecting the claim for back pay. In Cooper and Hodgson, however, both of which involved claims of discrimination by applicants who were refused employment, the real controversy was not whether the plaintiffs had been injured, but whether such injury was the result of discrimination.

The array of statistical evidence presented in this case by the plaintiffs strongly indicates that the effects of past racial discrimination have been perpetuated by the employment practices at Fairfield Works, and the court has placed great weight upon such evidence both in finding statutory violations and in tailoring injunctive relief to remedy the same. But proof that these practices have discriminated *on the whole* against black employees—or, stated another way, discriminated against the "average" black employee—is not evidence that William Hardy,[35] for example, has been damaged by a violation of Title VII. Nor, at least in the absence of evidence supporting punitive action

---

32. Concluding that the award of back pay in these cases is but a part of an equitable procedure, the court has denied any right to a jury trial. Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (CA5 1969); Lynch v. Pan American World Airways, Inc., 475 F.2d 764 (CA5 1973).

33. Also see 42 Am.Jur.2d Injunctions § 29.

34. The distinction between the burden of going forward with the evidence and the burden of persuasion, each sometimes meant under the label "burden of proof", is frequently blurred, even in cases which specifically deal with the issue. See, *e. g.,* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

35. Hardy, lead plaintiff in the first private action filed, is a significant example for the reason that he was a member of a group, blacks in the Blast Furnace Department of the Ensley Steel plant, with respect to which the evidence was sufficient to show injury from discriminatory practices on which individual damage claims were susceptible of fair approximation. Yet, when the lengthy "flow charts" were prepared showing the impact which the court decree would have made had such provisions been instituted by the parties back in July 1965, it turned out that Hardy himself had not been damaged by the old system, but indeed had greater earnings under it than the new system would have produced. The back pay awards were limited, of course, to those who had been injured, and accordingly Hardy himself got no benefits from the back pay award in favor of members of the class which he represented.

for wilful misconduct, does·the class action device transform individual claims into a "fluid" claim for the class as a whole. Cf. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (CA2 1973), cert. granted 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973).

 The applicable rule has been stated by the Fifth Circuit as follows:

> But, back wages are not to be automatically granted whenever a person is ordered reinstated. The wages sought must be "properly owing to the plaintiffs." This requires positive proof that plaintiff was ordinarily entitled to the wages in question and, being without fault, would have received them in the ordinary course of things but for the inequitable conduct of the party from whom the wages are claimed. Jinks v. Mays, 464 F.2d 1223, 1226 (CA5 1972).

This principle was, by quoting the foregoing with apparent approval, held applicable to Title VII cases in United States v. Georgia Power Co., 474 F.2d 906, 922 (CA5 1973), the court noting that a finding of racially disproportionate earnings due to employment practices is not by itself a proper premise for the making of a back pay award. Thus, in Bing v. Roadway Express, Inc.,[36] 485 F.2d 441 (CA5 1973), where one employee was found to be entitled under the evidence to back pay, other claimants were not: "The other four are not entitled to back pay because . . . even if Roadway had not been discriminatory, they could not have obtained road jobs earlier than they did. Therefore they suffered no financial loss from Roadway's discrimination." At 452. In a case such as the one *sub judice*, where employee initiative and choice are critical factors in the job selection process, it seems clear that the burden of proof must, consistent with traditional rules of jurisprudence, be placed on the claimant to establish his injury and damages.

In three situations this burden was carried; that is, the evidence showed that a particular group of black employees, or some of them, had been injured by an unlawful employment practice and, at least with supplementation of the original evidence, it would be possible to fix with a reasonable degree of accuracy, though not with exactitude and certainty, the approximate amount of their respective individual damages. The groups, and the causative employment practice involved, were: employees in the former Pratt City Car Shop LOP, where a needed merger of segregated lines was inexcusably rescinded until December 1971 (the *Ford* class); employees in the Blast Furnace Department of the Ensley Steel plant hampered by discriminatory lines of promotion ("1A–1B" configurations) (the *Hardy* class); and PM Finishing Hookers in Fairfield Steel's Plate Mill Department, whose promotional opportunities were

---

36. On the surface *Bing II*, by using qualification dates rather than application dates, may appear inconsistent with this decision. Insofar as seniority is concerned, footnote 12 of the *Bing II* opinion notes that "qualification date" is essentially only a variation on the theme of company seniority, which, under the particular circumstances of the case *sub judice*, is the equivalent of the plant seniority mandated by the court. This court's consideration of the significance of the bidding system upon the back pay claims is, however, somewhat at variance with the reasoning of the Fifth Circuit regarding Bing's back pay claim. The variance is thought to be justified by factual differences in the two cases. Here, the bidding system was recognized by the parties prior to July 1965 as giving, in the context of *Bing II*, transfer rights; in *Bing II* the "application" process was in July 1965 not a recognized right, but indeed contrary to the established no-transfer policy. Here, some three years of experience with the open bidding system had elapsed so that by July 1965 blacks knew— or should have known—that they could enter the formerly all-white LOPs; in *Bing II* the court recognized that in July 1965 blacks, with the exception of a few who had the courage to "fight the system", did not bother to apply because they knew full well that blacks were not going to be hired as road drivers. Here, there are scores of possible jobs of varying attractiveness to a given employee; in *Bing II* the issue related to a single higher-paying, higher-status job, obviating any real question of interest.

frustrated by placement of the Finishing Craneman jobs up in a separate line of promotion (the *McKinstry* class).

The basic approach to fixing the damage claims in these situations was to assume that the changes made in the affected LOPs by the court decree had been made on July 2, 1965, along with the changes in measurement of "age" (*i. e.*, by using plant age) and in defining when vacancies arose (*i. e.*, on force cut-backs of 15 days or more). The employees in the lines were assumed to possess equal fitness and skill and to be equally interested in accepting vacancies higher in the LOP.[37] Then a history was prepared since July 1965, showing deaths, retirements, transfers, increases and decreases in work forces, etc., and vacancy events thereby determined. Employees were then slotted into the vacancies using plant age and the assumptions indicated, producing in essence a flow chart of hypothetical personnel changes. Earnings in a hypothetical assignment were determined during a particular time segment by looking at the earnings in fact of the employee who actually had occupied that job, the number of hours actually worked during that same time by the assumed occupant at the job and multiplying those hours worked times the hourly rate of the hypothetical assignment. Then the employee's hypothetical earnings were compared to his actual earnings over the same period. Those shown to have sustained a loss by such study were then given an award of back pay equal to 150%[38] of the difference in earnings. Sixty-one employees received back-pay awards, most being several thousand dollars though with a spread from a low of $74.62 to a high of $9,851.90. The employment practices causing these damages were joint products of company and local union action, and, utilizing 42 U.S.C.A. § 2000e–2(c)(3), the court assessed one-half of each award against the responsible local union,[39] and the other half against the company.

Each flow chart involved assumptions as to a single LOP and the employees already in such LOP. Even so, many hours were required to make the necessary calculations. Other approaches suggested by plaintiffs were rejected by the court as inconsistent with the requirement to determine on an individual basis the actual loss caused by the unlawful employment practice.[40]

One might argue that, albeit with the expenditure of thousands of man-hours,

37. A variation was made in the *Ford* case due to the significant number of declinations of promotion by both white and black employees. One study was prepared assuming no declinations had the new system been in effect; a second study was prepared assuming the same declinations under the new system as took place under the old system. The results of the two studies were then averaged.

38. A 50% increment to the ascertained back-pay loss was added, essentially as a prospective-pay equivalent, because the affected employees, even under the decree, will require some additional time to reach their "rightful place." The best estimate of this was, on the average, some 3–4 years, which represents about one-half of the period involved in the study, hence the 50% increment.

39. The international union was not really responsible for the practices giving rise to the three back-pay awards. It should, moreover,

be noted that the international has taken a strong role of leadership, not always without disagreement from the locals, in pushing non-discriminatory policies.

40. Plaintiffs' suggestion that damages be ascertained by comparing average white employee earnings in the LOP during the period with the earnings of blacks is fundamentally inconsistent with the "rightful place" approach—the court should determine the loss caused by the unlawful employment practice, as distinguished from that which is the result of pre-Act discrimination independent of perpetuating policies. The suggestions regarding lump-sum payments, whether or not accompanied by distinctions based on age or years of employment, while easier in administration and probably more understandable to the affected employees, would result in some employees being paid more than their loss and others less, thus actually creating inequity among recipients of back pay.

comparable studies could be made to estimate damage caused by the hindrance to the bidding system resulting from use of occupational or LOP age. The court could, for example, be asked to hypothesize that entry into LOPs had been filled since July 1965, purely on the basis of departmental age without regard to the bidding system. But, apart from personal preferences, not all vacancies offer the same actual or apparent opportunities. The most senior employee would be slotted to the first vacancy, perhaps one with lower earnings than his pool job, and, indeed, due to lack of subsequent vacancies in upper jobs in the LOP, it might end up as the final spot for that employee. A younger employee under this hypothesized movement could experience the fortuitous circumstance of getting into a line which subsequently had a number of vacancies or increased work requirements, and move rapidly up to higher paying jobs. Perhaps the court would be asked to assume that the more senior employees, after entering an LOP, would have moved to another LOP having a subsequent vacancy. Or perhaps the court would be asked to reconstruct a progression using complete hindsight, i. e., look back now at all vacancies and operational levels in LOPs over the eight years, determine in retrospect which turned out to be "the best", and hypothetically assign the employees in order of department, plant or company age—such an approach would, of course, produce a fundamentally false methodology for measuring loss caused by any unlawful employment practice.

The ultimate conclusion, simply, is that in the particular context of this case the assessment of back pay for the pre-1963 discrimination systemically perpetuated by the effect of inhibiting seniority standards upon the bidding procedures would be fraught with speculation and guess-work.[41] What were problems in assessing back pay in the three situations in which the same was awarded are unsurmounted obstacles to the across-the-board claims for back pay generally. This conclusion is reached whether under the label of failure of proof,[42] Jinks v. Mays, 464 F.2d 1223, 1226 (CA5 1972), or under the label of equitably determining the true balance of interests, United States v. Georgia Power Co., 474 F.2d 906, 922 (CA5 1973).[43] As stated in *Georgia Power*,

> The trial court's decision must also include a weighing of issues as to limitations and laches . . . , factors of economic reality (*i. e.,* the relative expense of accurate determination of individual rights vis-a-vis the amounts involved) and, most assuredly, the physical and fiscal limitations of the court to properly grant and supervise relief. This listing is intended to be illustrative and not exhaustive. It is our intention to leave the issue altogether open for reconsideration and decision by the court below. 474 F.2d at 922.

If, as indicated, an accurate determination—or even a reasonably accurate estimate—of individual rights is to be a cornerstone for back pay awards, then,

41. While the analysis has dealt with the problems of entering lines of promotion, similar difficulties arise regarding promotions within many LOPs, particularly where there are branches in an LOP or where a job in an LOP actually has higher earnings than some job(s) above it in the line. It should be reiterated that this litigation is concerned with systemic discrimination; it has not determined, or attempted to determine, each claim of individual discrimination, such as the assertion of some black employee who may assert that the rejection of his bid on a job was racially motivated.

42. In this case it is not so much that the evidence is insufficient, as that the evidence adduced demonstrates that assessment of damages cannot be made consistent with applicable principles of law.

43. It should be noted that the court has considered the question of back pay both from the perspective of class action claims in the private suits and as part of the relief appropriately sought in the Attorney General's suit. In indicating to the parties in January 1973, its conclusion that the Attorney General was not precluded from seeking back pay for the victims of discrimination, the court, as it turned out, correctly predicted the decision of the Fifth Circuit in *Georgia Power*.

with the exception of the three specific situations noted, this cannot be done in the present case, and most certainly not within the physical and fiscal limitations of the court.

While it is clear that a claim for back pay cannot be defended on the lack of evil intent or even on a showing of good will, Rowe v. GM Corporation, 457 F.2d 348 (CA5 1972) (remanding for reconsideration of, *inter alia*, back pay notwithstanding strong evidence of good will), this is not to say that such matters are completely unworthy of any consideration, at least in equitably attempting to strike a true balance of interests. *See, e. g.*, LeBlanc v. Southern Bell Telephone & Telegraph Co., 333 F.Supp. 602 (E.D.La.1971), aff'd, 460 F.2d 1228 (CA5 1972); Jinks v. Mays, 464 F.2d 1223 (CA5 1972); Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002 (CA9 1972).

 Here, the company—particularly at upper management levels—and the unions—particularly at the international level, and their representatives—have been in the forefront of expanding employment opportunities for blacks. There is no need to recount the evidence which establishes the many initiative steps taken by them to eliminate racial discrimination, albeit still falling short by today's standards. They have modified the employment practices at Fairfield periodically to comply with all legal requirements as from time to time they with reason understood them to be. The Steelworkers union was, in fact, active in obtaining support for passage of Title VII. They had good reason to believe that the seniority system at Fairfield, lauded in Whitfield v. United Steelworkers, 263 F.2d 546 (CA5 1959), also was consistent with Title VII, at least in this circuit.[44] Though not a defense, reasonable good faith efforts at compliance merit some consideration, in equity, particularly where a purpose of back pay awards is to encourage non-judicial solutions.

 It should perhaps also be noted, though obvious, that in this case the parties being asked to provide damages have not received any monetary benefit from the conduct being proscribed. The recipients of the compensation which should have been paid to the victims of discrimination here are not the company and the unions, but rather fellow employees. As immediate displacement of incumbent fellow-workers through "bumping" is considered inappropriate, so also is any consideration of assessing damages directly against those who have benefited from the wrongful practice. The point is—though this, of course, is true in virtually all employment discrimination cases—that there is no factor of unjust enrichment for consideration by the court in weighing the equities.[45]

---

44. In Local 189 v. United States, 416 F.2d 980 (CA5 1969), the first appellate decision requiring a revision of a seniority system such as at Fairfield Works, the court saw no necessary conflict with the decision of the district court in United States v. II. K. Porter, 296 F.Supp. 40 (N.D.Ala.1968), which had upheld such a system in the steel industry. The District Court in United States v. Bethlehem Steel Corp. (Lackawanna plant), 312 F.Supp. 977 (W.D.N.Y.1970), concluded that remedies such as required in *Local 189* were inappropriate in the steel industry. A similar conclusion was reached by a Hearing Panel in the Matter of Bethlehem Steel Corp. (Sparrows Point Plant), OFCC Dkt. 102–68, issued December 18, 1970. Not until June 1971, was the *Bethlehem Steel* (Lackawanna) decision reversed by the Second Circuit, 446 F.2d 652. Even so, the *II. K. Porter* decision was then on appeal to the Fifth Circuit and, particularly in view of its treatment in the *Local 189* opinion, the strong possibility of a conflict in circuit decisions remained. An effort was made on behalf of the parties in the case *sub judice* to obtain information, at least tentatively, as to the Fifth Circuit's decision in *II. K. Porter* for guidance at Fairfield Works, but the decision has not yet been rendered. In forming the decision for Fairfield Works, no effort has been made to analyze factual differences from *II. K. Porter*. Rather, the court has, on the basis of the evidence produced in this case, concluded that violations of Title VII have occurred and formed remedial measures considered appropriate thereto.

45. Of course, some of the beneficiaries of the unlawful practices were black employees, just as some of those hindered by such prac-

Another factor for consideration in weighing the equities on an award of back pay is the extent of other relief being granted. In this case, concluding for the reasons already mentioned that back-pay should not be awarded to the rank-and-file black employee, though also recognizing that, while not susceptible of sufficient proof, black employees generally have suffered over a number of years from prior discrimination, the court, quite frankly, has made its injunctive relief somewhat broader than what might strictly be required to correct the statutory violations.[46] The award which cannot be made for pre-Act discrimination and which under the evidence should not be made for post-Act perpetuating policies is in part taking the form of broader injunctive relief for the whole class of black employees, including those who have not suffered the prior discrimination. In this sense the victims of past discrimination are responsible for a better legacy to the younger members of their race.

■■■ One further item bears mention; namely, the provision for a form of prospective pay. As part of the injunctive relief those pre-1963[47] employees who elect to take advantage of their new rights by entering new lines of promotion are provided earnings-protection, or "red-circling", in their new line. This is intended to make more meaningful those rights and applies, subject to appropriate limitations, during that first year after entering a new line in which they cannot use their plant age for promotional purposes. As distinguished from the formula used in the Bethlehem Steel Lackawanna settlement, the red-circle rate includes not only protection of the job class rate, but also the incentive earnings.

## ATTORNEYS FEES

■■■ The same policy that commends the award of back-pay is reflected in the statutory authorization to award attorney's fees to the prevailing parties. The special circumstances which prevented the court from awarding back-pay except in three situations are not, however, problems in the award of attorney's fees. Each of the cases brought by black employees, except for one relating to allegedly segregated facilities—which had been corrected prior to suit—, can properly be viewed as ones in which the plaintiffs prevailed. After consideration of the evidence presented in connection with application for fees, the court awarded fees in each of such cases (except the facility case, which had been abandoned) based on the traditional factors and on the policy of fairly supporting these "private Attorneys General" suits. The total awarded was $205,000.00, and was divided between the company and the particular local union involved in the case. It should be noted that but for the major role carried by the United States in its pattern and

---

tices were white employees. One may well question the equity of an award which required payment of back wages to those blacks underpaid (assuming the evidence were sufficient for such purpose) without giving any credit for over-payments to other blacks which were necessary results of the same act or procedure. Likewise, where a system is being reformed because of its effect on blacks generally, rather than from any actual desire to discriminate against blacks, one may question the equity of an award which failed to compensate those white employees who might be shown to have suffered loss from the very same system.

46. This is not to suggest that the remedial provisions establish any Utopia for black

employees, any more than the prior rules were so viewed by whites. Experience indicates that as new rights are obtained, other less annoying problems invariably are perceived as increasingly troublesome.

47. Only those employees who had service prior to the open bidding system should have been deterred from bidding by virtue of the inequitable seniority standards to be used in the line of promotion. As the conversion to the bidding procedure actually took place over a period of time, no one point clearly stands as "the" cut-off point. The court chose January 1, 1963, as, on balance, a fair place for demarcation.

practice suit, the time and, in turn, the award of attorney's fees would no doubt have been even more substantial.

## DECISION

The findings of fact and conclusions of law contained in this memorandum were the basis for the court's decree of May 2, 1973, and its judgment of August 10, 1973.