520 F.2d 1043
 11 Fair Empl.Prac.Cas. 553,
10 Empl. Prac. Dec. P 10,436
UNITED STATES of America, Plaintiff-Appellant,
v.
UNITED STATES STEEL CORPORATION et al., Defendants-Appellees.
John S. FORD, et al., Plaintiffs-Appellants, Clifford Craig
and L. G.Phillips, Movants-Appellants,
v.
UNITED STATES STEEL CORPORATION et al., Defendants-Appellees.
 No. 73-3907.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 8, 1975.
 
 Beatrice Rosenberg, Asst. Gen. Counsel, EEOC, Washington, D. C., Robert T. Moore,, Louis G. Ferrand, Employment Section, Dept. of Justice, Washington, D. C., Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., for United States.
 James K. Baker, Oscar W. Adams, Jr., U. W. Clemon, Birmingham, Ala., Barry Goldstein, William L. Robinson, Jack Greenberg, New York City, for John S. Ford, and others.
 Demetrius C. Newton, David H. Coar, Birmingham, Ala., for C. Craig & L. G. Phillips.
 Jerome A. Cooper, Birmingham, Ala., Michael H. Gottesman, Washington, D.C., for United Steelworkers of America.
 James R. Forman, Jr., W. K. Murray, Birmingham, Ala., for U. S. Steel.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before THORNBERRY, MORGAN and CLARK, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 These appeals arise from a sharply-contested employment discrimination case which involves over 3,000 black steelworkers. The proceedings below culminated in a decree, entered May 2, 1973, in which District Judge Pointer ordered major changes in the seniority structures at the nine plants of defendant United States Steel Corporation's Fairfield Works, Birmingham, Alabama. Of main interest for present purposes, Judge Pointer found that the Fairfield seniority systems (occupational, line of progression, and departmental) products of collective bargaining between the company, the United Steelworkers of America, AFL-CIO, and various locals operated to lock blacks into lower-paying and less-desirable jobs, and thus perpetuated the effects of the company's pre-Title VII active racial discrimination in hiring and initial assignments. The district court ordered implementation of a broad scheme of plant service seniority, rate retention ("red circling"), racial quotas for hiring and promotion, and other remedies designed to eradicate continuing impediments to blacks' reaching their "rightful places." Those measures are not before us for review, as the defendants did not appeal from the court's findings or the decree.
 
 
 2
 A number of complaints were consolidated below for trial. Out of six certified private class actions brought pursuant to 42 U.S.C. § 2000e-5 and 42 U.S.C. § 1981, involving 464 black employees, the district court awarded back pay to sixty-one members of three classes (the Hardy, McKinstry, and "original" Ford classes). No appeals were taken with respect to those three classes. The government also litigated a "pattern or practice" suit, 42 U.S.C. § 2000e-6, and sought back pay for the approximately 2,700 remaining blacks in the Fairfield production and maintenance workforce. This prayer was denied, and is the subject of the present appeal.
 
 
 3
 The government, however, has withdrawn its appeal in favor of the nationwide steel industry settlement, to which United States Steel and the Union are parties. See United States v. Allegheny-Ludlum Industries, Inc., 5 Cir. 1975, 517 F.2d 826. In this court the representative appellant for the rank and file black workers on whose behalf the government unsuccessfully sought back pay below is John S. Ford, who, throughout the trial, represented only thirty-five blacks in the Fairfield Car Shop of the Rail Transportation Division (the "original" Ford class). The substitution was accomplished by Judge Pointer in the May 2 decree, wherein he summarily enlarged the "original" Ford class so as to include in a F.R.Civ.P. 23(b)(2) class action judgment all blacks employed at Fairfield prior to January 1, 1973 who were not otherwise represented in a private class action. Thus, the district court designated in practical and legal effect a "new" Ford class.
 
 
 4
 The now-unchallenged facts which supplied the bases for findings of liability on the part of the company and the unions, and hence the works-wide injunctive relief, are reported with the opinion of the district court, United States v. United States Steel Corp., N.D.Ala.1973, 371 F.Supp. 1045, 1049-57. The "new" Ford class appeal involves issues concerning the manageability of the class action and whether back pay is available to putative class members. There is in addition an appeal by a group of former black and white ore miners from the denial of their application for permissive intervention pursuant to F.R.Civ.P. 24(b). That is denominated the Craig appeal. Following careful consideration of the district court's opinion, the briefs and oral arguments of the parties, together with the parties' Joint Appendix, we are of the opinion that the district court must be charged with an abuse of discretion in the denial of back pay to every member of the new Ford class. This is largely due to a recent series of binding case law developments in this circuit and in the Supreme Court. These cases were decided subsequent to December 11, 1973, the date of the district court's opinion, and therefore Judge Pointer did not have the benefit of them. Furthermore, subsequent to the May 2, 1973 enlargement of the "original" Ford class or, if one prefers, substitution of the "new" Ford class this court sitting en banc issued guidelines addressed to the handling of Rule 23(b)(2) employment discrimination class actions in the trial courts. Whether the substance of these guidelines was observed below is not apparent from the record.
 
 
 5
 On remand, a variety of additional determinations must be made before this case will be capable of assured resolution. We therefore vacate the denial of back pay to the group on whose behalf the government sought back pay below (the "new" Ford class), and remand for further proceedings consistent with this opinion and other controlling authority. On remand the district court should carefully redetermine the propriety of the amorphous "new" Ford class in light of the consequences of binding such a group to a final judgment. Also, specific findings should be made with regard to the availability of back pay and certain of the defendants' special defenses. Finally, it is necessary that the district court reexamine its legal approach in the context of the foregoing tasks. The existing analysis is no longer acceptable if ever it was to justify a generalized conclusion that back pay should not be awarded to victims of employment discrimination. To the extent that the trial court may conclude that additional back pay is now warranted, it should proceed to Stage II of the bifurcated class action procedure, discussed infra. At that point it should invite the parties' proposals for computation and distribution, and select a reasonable method for making the affected class whole, while avoiding as far as possible the "quagmire of hypothetical judgments."
 
 
 6
 We are of the view that the present record in the Craig appeal presents essentially a grievance by ore miners generally the use of plant age instead of company age for seniority purposes rather than a complaint by blacks that whites were discriminatorily favored in promotion and regression. The testimony relevant to intervenors' application indicated that the focal feature of the seniority system affected the 593 whites and 331 blacks in the same manner: all lost company (ore mine) seniority when assigned to Fairfield Steel Plant. The district court correctly determined that this does not present a palpable Title VII dispute. "The Act does not require a remedy for those not discriminated against." Gamble v. Birmingham Southern R.R., 5 Cir. 1975, 514 F.2d 678, 686. Intervenors now indicate they are prepared to make a specific showing of discrimination directed at black ore miners in violation of Title VII. We conclude that this appeal must be dismissed for want of Title VII jurisdiction, irrespective of other requirements for intervention. Whether the proffered showing should be allowed by way of a repleaded application and new evidence in support of intervention will be a question for the district court on remand.
 
 
 7
 We now proceed to outline the parameters of the district court's inquiry on remand.
 
 I. THE "NEW" FORD CLASS ACTION
 
 8
 Judge Pointer's designation of the "new" Ford class dovetails with his most complicated set of findings and reasons for denying back pay to the class's members: "failure of proof" or "equitably determining the true balance of interests." 371 F.Supp. at 1061. In three private class actions, involving around 360 black steelworkers, the court found from the evidence specific aspects of the pertinent seniority structures which it was able to identify as having caused economic injury to certain class members. Id. at 1059-60. Sixty-one individuals received awards of back pay which were measured with a substantial degree of certitude. In the broader government ("new" Ford) action, Judge Pointer denied back pay, not for want of evidence of racial discrimination such evidence was abundant in statistical form but because he was unable to isolate specific causal factors to explain earnings disparities between an average black and average white worker in a given production and maintenance line, ability and plant seniority being relatively equal. Noting that under the Fairfield open bidding and job classification scheme "choice and chance," id at 1053 (emphasis in original), played major roles in predicting every line or pool employee's success irrespective of race or seniority lock-in, see id. at 1059 n.36 Judge Pointer "presumed" damages for purposes of injunctive relief, id. at 1058, but concluded that individualized back pay could not reasonably be afforded "within the physical and fiscal limitations of the court." Id. at 1061-62.
 
 
 9
 It is simply unclear whether the district court believed that individual awards of back pay to class members must be predicated on proof of each discriminatee's personal economic loss and racially-discriminatory causation at the liability stage (Stage I) of the trial. Appellant Ford argues that Judge Pointer did so believe, and certain portions of the opinion support the argument. E. g., id. at 1058 & n.35. On the other hand, the court in fact proceeded to a second, individualized stage, see Baxter v. Savannah Sugar Refining Corp., 5 Cir. 1974, 495 F.2d 437, 443-45, cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974), with respect to the three private classes in which back pay was awarded. 371 F.Supp. at 1059. Moreover, it appears that the court clearly recognized the liability phase's emphasis on proof of broad patterns and practices, as opposed to individual damages. Id. at 1053 & n.18, 1061 & n.41. Also, Judge Pointer correctly anticipated our decision in United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, where we held that the government may seek and recover back pay for discriminatees in a "pattern or practice" action. 371 F.Supp. at 1061 n.43. In summary, the critical factor by which Judge Pointer distinguished the large government suit from the smaller private classes was his ability in the latter instances to identify the causal discriminatory features of the seniority systems and the manner in which they affected those classes, in contrast with his inability to make such determinations in the former case. See id. at 1059.
 
 
 10
 As if to illustrate this justification for denying back pay, Judge Pointer considered several possible methods by which back pay arguably might have been awarded to the members of the "new" Ford class. He rejected these approaches as either inequitable and lacking in probative value (gross comparison of average black and average white earnings in the line of progression); inequitable and overly speculative (factor out the chance of bidding into jobs that turned out less advantageous in the long run); or inequitable and unduly complex in terms of time and expense (use complete hindsight to flow chart all historical vacancies and operational levels; hypothetically assign the most senior blacks to the openings that turned out to be most advantageous). Id. at 1060-61. The latter two methods would yield similar, if not identical results, and probably either would have led in some instances to the quagmire, see Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 260-61. Yet in the cases of the sixty-one blacks to whom he awarded back pay from among some 360 potential recoverees in three private classes, it appears that Judge Pointer did utilize a method which resembled the approaches he rejected for the larger group. It is clear that the court reconstructed eight years of workforce changes in the three departments and hypothetically assigned plant-senior blacks, in order of plant seniority, to the vacancies (redefined in light of the decree) which the court determined those blacks would have occupied but for discrimination. The effect of the bidding system, moreover, is reflected only in the awards within the "original" Ford class, where the court found a "significant number of declinations of promotion by both white and black employees." 371 F.Supp. at 1060 n.37. The court elected to disregard the bidding system in the Hardy (Ensley Steel Plant blast furnace department) and McKinstry (finishing hookers in the Fairfield Plate Mill) classes. The defendants have not complained of the court's approach as to those two classes.
 
 
 11
 Appellant Ford strongly contends that the district court's denial of back pay to the larger class of nonrecoverees reflects a manifestly erroneous reliance on "difficulty of ascertainment," a theory which this court has discredited as a general defense to back pay liability. E. g., Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1364, 1380; Pettway, supra. There are, however, two distinct aspects of both the back pay problem and Judge Pointer's reasoning. First, there is the requirement that the economic disparity the damages be the reasonably certain result of unlawful conduct perpetrated against the aggrieved individual or the class to which he belongs. See 42 U.S.C. § 2000e-5(g). But second, once a court has determined that a defendant's inequitable conduct caused some damages to the class, or to a representative sample of its members, then the burden falls upon the wrongdoer to explain away or disprove the damages which each claimant's evidence arguably supports. In other words, our decisions established that, with respect to computing those damages which are the reasonably certain result of the wrong,
 
 
 12
 (1) unrealistic exactitude is not required, (and) (2) uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer.
 
 
 13
 Pettway, supra, 494 F.2d at 260-61 (footnotes omitted); see also Johnson v. Goodyear, supra. Although it appears that Judge Pointer recognized these distinct problems, his opinion confuses them. Statements which may fairly be read to rely on the absence of proof of each discriminatee's individual loss at the liability stage add to the confusion. 371 F.Supp. at 1058.
 
 
 14
 Hence, the decision below yields an anomalous contrast. The evidence demonstrated that, since 1965, certain features of the seniority systems had operated widely to reduce blacks' mobility to better jobs in production and maintenance units, including supervisory positions and trades and crafts, and furthermore to deny blacks the training and preparation necessary for advancement to the better jobs. The district court found that those features perpetuated the effects of past discrimination in violation of Title VII and ordered injunctive reforms. In three relatively small departmental classes, moreover, the court could identify specific features which had caused economic losses to the classes, and awarded back pay to certain class members after taking additional evidence. Nowhere did the court draw a qualitative distinction between the discrimination practiced against the small classes and that practiced against the "new" Ford class, yet it denied back pay throughout the latter group. Thus, the only distinction of substance followed from the district court's inability to discern causal factors as to the larger group's losses in the sense that damages, to be compensable, must be the result of a legal wrong and not some other cause. This inability may have been compounded by a misunderstanding of the role of individual proof at the liability stage (Stage I).
 
 
 15
 We believe that both of these difficulties can be largely obviated on remand by the fundamental expedient of reexamining the scope of the "new" Ford class. In a conscientious effort to eliminate multiplicitous litigation by binding the otherwise unrepresented employees to a Rule 23(b)(2) class judgment in which able counsel on both sides had vigorously and thoroughly litigated the issues, the district court created a class which it found in essence to be so diverse and unmanageable that the effects of unlawful discrimination could not be separated from other plausible, but not demonstrably unlawful, causes of members' reduced earnings. On remand the district court should conduct a hearing and take evidence as to the propriety of the "new" Ford class, its scope in terms of the ingredients of the judgment, if any, by which it ought to be bound, and its size and membership. General guidance is contained in our en banc opinion, Huff v. N. D. Cass Co., 5 Cir. 1973, 485 F.2d 710, although the court should tailor its inquiry on remand to the particular circumstances of this case. We do not intend to restrict the focus of a highly serious determination which must involve great flexibility, and concerning which the district court bears special responsibility. See Hutchings v. United States Industries, Inc., 5 Cir. 1970, 428 F.2d 303, 310-11.
 
 
 16
 Inasmuch as the issues already have been thoroughly litigated, at least from the standpoint of basic liability and systemic injunctive relief, the district court need not fear to tread preliminarily on the merits of a classwide request for back pay. The question on remand will be comprehensive and multifacited: the extent to which the "new" Ford class is maintainable in a "meaningful and manageable" sense as a class action seeking monetary relief. Huff, supra. As a corollary matter, the court should consider the adequacy of the representation, F.R.Civ.P. 23(a)(4), which in this court has been impressive. In this respect the court should consult Huff, supra, Johnson v. Georgia Highway Express, Inc., 5 Cir. 1969, 417 F.2d 1122, 1125, and Judge Godbold's specially concurring opinion in that case. We also suggest that the court enter findings in support of its determination.
 
 
 17
 If the district court again concludes that the "new" Ford class action should go forward, the matter will not then be ended, nor will it automatically be appropriate to proceed to Stage II, as described in Baxter, supra. It seems to us that much trouble might be eliminated though we encourage the district court's independent judgment on the point by the use of subclasses under Rule 23(c)(4). See the discussion in Nix v. Grand Lodge of Int'l Assn. of Machinists, 5 Cir. 1973, 479 F.2d 382, 385-86, cert. denied, 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973). See also Weathers v. Peters Realty Corp., 6 Cir. 1974, 499 F.2d 1197, 1200; Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28, 35; Oatis v. Crown Zellerbach Corp., 5 Cir. 1968, 398 F.2d 496, 499; 7A C. Wright & A. Miller, Federal Practice and Procedure § 1790 (1972).
 
 
 18
 It appears that the district court's principal difficulty with the "new" Ford class was its size and diverse composition. Those aspects have made meaningful review equally problematic for this court. A large variety of employment practices coalesced to greater and lesser degrees to affect groups of black employees across different plants, departments, job classifications, and earned seniority levels throughout Fairfield Works. In considering whether to designate subclasses for the purpose of back pay, the district court has at its disposal the injunctive decree of May 2, 1973, the decree's Appendices, and the parties' lengthy stipulation which describes the seniority and job classification systems during Fairfield's history up to the trial. These items provide substantial assistance in identifying those departments and lines which were affected by specific practices ordered enjoined, and the contexts and effects of the unlawful practices. The district court by now is intimately familiar with the case and should encounter no impassable obstacles in drawing subclass lines on the basis of the objective commonality of particular seniority effects as to given groups of employees. We believe that this approach may greatly facilitate the court's determination of the groups of employees within the larger class who are entitled to proceed to Stage II and the presentation of individual back pay claims. Likewise, it should provide this court with a complete picture of the district court's mental processes in the event this lawsuit again comes before us.
 
 
 19
 In conclusion to this part we dispose of several arguments which are ancillary to the basic class action problems. Initially, we reject appellee United States Steel's argument that appellant Ford lacks standing as a matter of law to represent any class of black employees broader than the " original" Ford class, in which his personal back pay claim has been satisfied. The scope of Mr. Ford's standing is a matter which the district court should address in the first instance as an element of the inquiry on remand. The court should consider the question in light of Jenkins, supra, and Long v. Sapp, 5 Cir. 1974, 502 F.2d 34, 42, together with any other relevant cases. Nor do we accept the argument that the designation of a "new" Ford class constituted inherent error or an unauthorized substitution of parties. Rule 23(c)(1) does require the court to determine the propriety of a class action "(a)s soon as practicable" after its commencement, but the rule adds that the order "may be conditional, and may be altered or amended before the decision on the merits." What is of immediate concern to us is not the class modification standing alone, but the analysis upon which it was entered and the mischief which it inadvertently produced with regard to back pay. The modification itself is not unique in either its purpose or its timing. See, e. g., Hairston v. McLean Trucking Co., M.D.N.C.1974, 62 F.R.D. 642, 663-64. It is literally authorized by Rule 23, provided other constitutional and procedural safeguards are satisfied. Finally, we disagree with appellant Ford's argument that we may venture no review whatever of the class enlargement, for want of a notice of cross-appeal by the appellees. F.R.App.P. 4(a). By contrast with a trial ruling which results in the sustaining or denial of a claim or defense, the certification of a class action involves important considerations of judicial housekeeping. If we assume, somewhat skeptically, that formal notice of cross-appeal is necessary to bring this class action order forward, we would hold nonetheless that the circumstances of this case are sufficient to bring the order within the principle that "the rules themselves ought not be allowed to subvert the 'just' result which 28 U.S.C. § 2106 obliges every appellate court to reach in cases lawfully brought before it for review." 9 J. Moore's Federal Practice P 204.11(5), at 948 (1973) (footnote omitted). In any event, this circuit is committed to the proposition that "(a)ction by the court on maintainability may be triggered by motion of the parties or on the court's own initiative." Huff, supra, 485 F.2d at 712 (emphasis added). Just as the district court took up the matter without formal request by any party below, this court may properly do likewise in the interest of justice.
 
 II. BACK PAY
 
 20
 In Part I we summarized the chief reasons upon which the district court denied back pay to the "new" Ford class: the inability to identify and distinguish the various causes of class members' economic losses, perhaps with some emphasis on the difficulty of ascertaining the amount of compensable damages. Just as the court's discussion of these problems is unclear, it is also unclear whether Judge Pointer's concern lay with the proof of economic injury to the class, or with the absence of each member's individual proof at the liability-injunction stage (Stage I). The court also gave other, less prominent reasons for denying back pay: lack of bad faith on the part of the defendants; good faith efforts to comply with the law together with reliance on judicial and administrative decisions which had given positive treatment to steel industry seniority systems; the absence of unjust enrichment to the defendants; and the breadth of other affirmative relief. 371 F.Supp. at 1062-63.
 
 
 21
 As general or complete defenses to recovery of back pay by any employee, the district court's reasons must fail. Controlling precedent disposes of absence of bad faith, no unjust enrichment, and broad injunctive relief as a counterweight for denial of back pay. See Albemarle Paper Co. v. Moody, --- U.S. ---, ---, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280, 299 (1975); Baxter, supra, 495 F.2d at 442-43; Pettway, supra, 494 F.2d at 252-53; Johnson v. Goodyear, supra, 491 F.2d at 1376-77; United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, 921. With deference to Judge Pointer, we recognize his precognition that the absence of bad faith or even the presence of good faith will not by itself defeat a claim for back pay, but is at best a factor to be considered in the larger balance. 371 F.Supp. at 1062. Accord, Moody, supra, --- U.S. at ---, 95 S.Ct. at 2374, 45 L.Ed.2d at 299 (majority opinion); --- U.S. at ---, 95 S.Ct. at 2389, 45 L.Ed.2d at 315 (Blackmun, J., concurring in the judgment).
 
 
 22
 Also to be rejected are the burden of proof-equitable balance justifications mentioned earlier, along with the reliance theory, which we treat infra as a special defense. With regard to the proof problems, the inquiry and procedure we suggested in Part I should assist the court on remand in identifying particular groups of employees who are entitled, one-by-one, to present personal claims for back pay. Not unreasonably at the time of his decision, Judge Pointer read certain language in our Georgia Power opinion,474 F.2d at 922, as authorizing a blanket denial of back pay as a matter of discretion in view of the proof, causation, and computation problems posed by the "new" Ford class's claim. 371 F.Supp. at 1059, 1061. Indeed, after our subsequent opinion in Johnson v. Goodyear, supra, one might have thought that a conflict existed within this circuit as to the circumstances under which a district judge could decline to award back pay to an aggrieved class, despite findings of employment discrimination practiced against the class. Later in Pettway, however, all doubt was resolved in favor of the Johnson v. Goodyear presumption, which entitles the class to proceed with individual claims for back pay once the class representative has made out a prima facie case of systemic discrimination. There Judge Tuttle (who also authored Georgia Power) explained the Georgia Power language as an expression of factors to be considered in connection with the individual claimant's burden, rather than the class's:
 
 
 23
 This holding (in Johnson v. Goodyear ) is entirely consistent with, and flows from our decision in Georgia Power that the presumption in favor of a member of a class discriminated against does not per se entitle an employee to back pay without some individual clarification. (citing Georgia Power, 474 F.2d at 921-22).
 
 
 24
 494 F.2d at 259 (emphasis added). Thus, regardless of what might have been a reasonable reading of Georgia Power at one time, that case can no longer be taken for the sweeping proposition that "factors of economic reality . . . and . . . the physical and fiscal limitations of the court to properly grant and supervise relief" may operate to preclude an award of back pay to every aggrieved employee in a large class action.
 
 
 25
 Instead, in an effort to relieve tension between management difficulties with numerous, sometimes diverse claimants and Title VII's policy of compensation for discrimination-caused economic injuries, this court has established a bifurcated approach in class actions seeking back pay. At Stage I the class must demonstrate a prima facie case of employment discrimination. Sometimes statistical evidence alone will suffice; on other occasions live testimony or additional exhibits may be necessary. At all events, however, the stress at Stage I is upon demonstration of the defendant's broad employment policies and practices, the defendant's rebuttal and business necessity defenses, and the inferences which remain at the close of the evidence. See United States v. T. I. M. E. D. C., 5 Cir. 1975, 517 F.2d 299 at 315-16; Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, 53-55; United States v. Hayes International Corp., 5 Cir. 1972, 456 F.2d 112, 120. Although the district court may then find liability and conclude that injunctive relief is appropriate, as did the court below, it is improper at Stage I to require any particular discriminatee to prove personal monetary loss. Baxter, supra, 495 F.2d at 443.
 
 
 26
 Thus, the focus at the close of Stage I is still upon the class, as opposed to any particular putative member. As we noted earlier, once the class has proven a prima facie case of discrimination as was done below then it is presumptively entitled to move into Stage II with the presentation of individual back pay claims. Johnson v. Goodyear, supra. This presumptive entitlement serves the important function of filling the logical hiatus between large-scale practices and statistically significant effects, which were shown at Stage I, and individual members' claims for sums of money due, which have not yet been demonstrated. At this point the basic question which seemingly perplexed the district court arises: may the court, consistently with the "make whole" purpose of back pay, require a class or subclass to demonstrate some tangible economic loss as a class or subclass, attributable to one or more proven discriminatory practices? In other words, may the court condition the presumption upon some quantifiable showing of causation between inequitable conduct and economic injury-in-fact to an objectively and empirically homogeneous group qua group?
 
 
 27
 We need not further constrict the district court's statutory discretion by saying that it may never do so under any circumstances. Logically, a suit that proceeds as a class action for monetary relief necessarily contemplates some degree of proven economic damage to the class in general, as a result of the defendant's violations. Where, as here, the circumstances of a large class action raise occasional issues of alternative causation as with the bidding system and the irregular correspondence between hourly wages and job classification some minimal burden on a given group may be appropriate. On the other hand, the fact that a defendant has managed to discriminate against many people instead of a few is no ticket to freedom from liability to those who suffered less than the most obvious victims. "Important national goals would be frustrated by a regime of discretion that 'produce(d) different results for breaches of duty in situations that cannot be differentiated in policy.' " Moody, supra, --- U.S. at ---, 95 S.Ct. at 2371, 45 L.Ed.2d at 296, quoting Moragne v. States Marine Lines, 398 U.S. 375, 405, 90 S.Ct. 1772, 1790, 26 L.Ed.2d 339. Moreover, any causation burden which the court imposes on the group, as such, must be not only minimal in weight, but also very general in scope, so as to avoid converting the procedure into the protracted series of claimant-by-claimant trials which Baxter commits to a later stage.
 
 
 28
 With these considerations in mind, and cognizant of our responsibility to "maintain a consistent and principled application of the backpay provision," Moody, supra, --- U.S. at ---, 95 S.Ct. at 2373, 45 L.Ed.2d at 299, we conclude that the district court may require a class or subclass to come forward, as a part of the class or subclass prima facie case, with some threshold showing of economic loss and causation, if the defendant's evidence has drawn into substantial question the group's entitlement to move into Stage II claimant-by-claimant. In all likelihood the defendant's ability to raise substantial doubt about the group's entitlement will occur only rarely. We anticipate that the defendant would have to show convincingly, and with statistically fair exhibits, that a given group of discriminatees outearned, or at least earned as much as, a plant seniority-comparable group of whites during the discriminatory period. Even this kind of showing will not defeat the right of each member of the group to claim back pay at Stage II, if the class representative can make a reasonable argument that the exhibit is distorted, or that a significant number of members might have earned even more than their white contemporaries but for the continued effects of discrimination. Positive proof by each member of the group is not necessary at that point. The representative need only raise on behalf of the class a reasonable inference of "cognizable (economic) deprivations to it as a class," Baxter, supra, 495 F.2d at 443, "based on racial discrimination by the employer (or union) in the employment relationship." Johnson v. Goodyear,supra, 491 F.2d at 1375. This inference justifies the presumption which entitles the group to move into Stage II.
 
 
 29
 On remand the district court should reconsider its approach to back pay for the "new" Ford class in light of the preceding discussion. The procedures suggested in Part I, supra, may well facilitate the court's task. Considerations of judicial efficiency are important, but there is no reason why the need for efficiency cannot be reconciled with what is by now a nearly certain, if not "automatic or mandatory," duty to award back pay to discriminatees who can prove their entitlement to monetary recovery. Cf. Moody, supra. In the event the court again decides that any particular group within the affected class should not go forward to Stage II, it must carefully articulate its findings and conclusions. Id. --- U.S. at --- n.14, 95 S.Ct. at 2373 n.14, 45 L.Ed.2d at 299 n.14; Stevenson v. International Paper Co., 5 Cir. 1975, 516 F.2d 103, at pp. 117-118.
 
 
 30
 Insofar as the district court may conclude that additional back pay is now in order, the burden-of-proof rules respecting individual claims are set forth in Baxter, 495 F.2d at 443-45, and Johnson v. Goodyear, 491 F.2d at 1379-80. These rules generally contemplate a scheme of proof, computation, and distribution initiated by a series of claimant-by-claimant trials, and we have spoken accordingly heretofore in describing the functions of Stage II.
 
 
 31
 After consulting Pettway, supra, 494 F.2d at 258, with regard to Alabama limitations, the beginning date, and the closing date of the back pay period, the district court, with the assistance of the parties, should strive to the fullest practicable degree to award back pay by reconstructing hypothetically each eligible claimant's work history. This was done in the cases of the sixty-one employees who received back pay following the trial below. 371 F.Supp. at 1060. To the extent that actual, historical vacancies in the employer's workforce can be flow-charted with reasonable accuracy, the court should award the back pay to the minority employees who, in its sound judgment, would have occupied those vacancies but for discrimination, and whose projections show a loss of wages. Part of "(t)he key is to avoid . . . granting a windfall to the class at the employer's expense . . . ." Pettway, supra, at 262 n.152. Therefore, if the parties can reasonably reconstruct the history of the changes in the Fairfield workforce, the court should utilize those data for identifying "vacancies" in light of its decree, and should not presume that additional vacancies occurred. Apart from protecting the defendant, this method has the virtue of distributing the recovery to the victims who, by the greater likelihood, are entitled to it.
 
 
 32
 On the other hand, the remainder of "the key" is to avoid "the unfair exclusion of claimants by defining the class or the determinants of the amount too narrowly." Id. Quite probably there are some aggregations of claimants, similar in plant seniority and ability, each of whom might reasonably be slotted into the same historical vacancy and awarded a "winner-take-all" sum of back pay. Obviously, this cannot be done if the court is to remain faithful to the actual experience in the plant. Such a situation calls forth the "quagmire of hypothetical judgment" for which Pettway, 494 F.2d at 262-63, suggests several alternative solutions. The district court is free to consider the classwide approaches suggested in Pettway, as well as any other reasonable methods for making the affected class whole. We commend the court particularly to the use of pro rata shares, id. at 263 & n.154, in those instances where the quagmire persists even after reasonable efforts geared toward greater individual certainty have been attempted. This method involves a distribution across the affected group of the sum which represents the largest loss suffered by a group member who, as likely as any other, could have occupied the vacancy in question but for discrimination. Individual awards can be computed for each member of the group by the use of a linear progression formula. For example, if during a given period white A, with less plant seniority, occupied a job at which he earned $15,000, but blacks B, C, D, E, and F, with respective earnings in lower jobs of $10,000, $11,000, $12,000, $13,000, and $14,000, each were equally capable and substantially equal in superior plant seniority, than their pro rata recoveries for the period could be computed as follows: 5x k 4x k 3x k 2x k x = $5,000. The variable, x, comes to roughly $333. Thus, B, whose hypothetical loss is five times greater than F's, recovers about $1,665; C recovers $1,332; D takes $999; E recovers $666; while F, who suffered the least economic injury, recovers $333. The defendants may wish to argue that under no circumstances would employee F, the one with the most damages, or for that matter any of the other discriminatees, have succeeded to the job ahead of A, or ahead of another black. The defendants have the burden of persuasion on the point, by a standard of "clear and convincing" evidence. Johnson v. Goodyear, supra, 491 F.2d at 1380.
 
 
 33
 Of course, the pro rata method will seldom, if ever, work out as conclusively or as simply as the example. The threshold determination of the eligible group of employees will often present complex factual issues. The court that opts for a pro rata method will have to deal with tediously-computed fractional constants in most cases. By suggesting such a method we do not intend to exclude other reasonable alternatives, for we recognize that "the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." Moody, supra, --- U.S. at ---, 95 S.Ct. at 2373, 45 L.Ed.2d at 299. Also, we reemphasize that alternative methods possessed of superior certainty should be exhausted before the court resorts to racially-drawn classwide comparisons or pro rata approaches. See Judge Bell's specially concurring opinion in Pettway, supra, 494 F.2d at 267. Similarly, the indiscriminate black-white wage averaging approach advanced by the plaintiffs and rejected by the district court, 371 F.Supp. at 1060 n.40, would seem to be foreclosed by our decision in Georgia Power as a basis for making individual awards, see 474 F.2d at 921-22, absent at least a precise breakdown of subgroups from the standpoint of plant age. See Pettway, supra, 494 F.2d at 262, discussing Stamps v. Detroit Edison Co., E.D.Mich.1973, 365 F.Supp. 87, 121-22 (rev'd on other grounds, sub nom., Equal Employment Op. Com'n v. Detroit Edison Co., 6 Cir. 1975, 515 F.2d 301). In conclusion, we express full confidence in the ability of the district judge to achieve a result consonant with the important compensatory purpose of back pay. The court is free to appoint a master to assist with Stage II, and, as always, the parties are free to negotiate a settlement.
 
 
 34
 As a caveat to our discussion of back pay, we add a few remarks which are necessary to place this matter in full perspective. On December 19, 1974, Judge Pointer entered, as between the government and the defendants, an amendment which conformed the May 2, 1973 Fairfield decree to the industry-wide consent decrees which we upheld in United States v. Allegheny-Ludlum Industries, Inc., supra. The amendment provides that the back pay under Consent Decree I shall become available to eligible Fairfield employees (1) upon "exhaustion of all appellate proceedings" in Allegheny-Ludlum, in which appellant Ford is an intervenor challenging the settlement's legality; and (2) "upon receipt of a remand, if any," from this court in this appeal. Thus, it is clear that the back pay provision of Consent Decree I will not apply to Fairfield Works unless and until both conditions are met. Timewise, there is no way to foretell how quickly the back pay under the settlement will become available at Fairfield, nor could we predict how quickly any class or subclass involved in this appeal might reach the stage of individual back pay relief. Either could involve anywhere from a few weeks to many months. Nevertheless, we point out that the liability stage of the trial in this case was completed almost a year prior to the entry of the consent settlement. Under these circumstances, we conclude that those Fairfield employees who fall within the description of a class or subclass duly certified by the district court on the remand of this case, pursuant to F.R.Civ.P. 23(b)(2), shall look at all times to this case for their back pay. In specific instances this case may yield more money than the consent decree; in others it may yield less. Yet, insofar as this action continues toward final repose as a Rule 23(b)(2) class action, there will be no "opting out" by individual class members at any point. LaChapelle v. Owens-Illinois, Inc., 5 Cir. 1975, 513 F.2d 286, 288 n.7. But cf. Pettway, supra, 494 F.2d at 263 n.154. To the extent that the class of eligible black employees under the consent decree overlaps with the Fairfield class or classes and presently there is considerable overlap the latter employees' identification with this case will serve the interests of both sides. It will ensure contested, adjudicated compensation to Fairfield employees who are so entitled; it will preserve whatever cohesiveness they achieved prior to the entry of the consent decrees; and it will protect the defendants from the risk of employees gambling on greater or double recoveries under the consent decree. Conversely, in the event the consent decree funds earmarked for Fairfield become available while this case is before the district court, the defendants ought to be able to use those moneys to the extent they are adequate in satisfaction of back pay judgments which may be rendered on remand. There is nothing in the conforming amendment or the May 2 decree which suggests that Consent Decree I's allotment for Fairfield should not be distributed in that fashion, provided the defendants observe the consent decree's terms as to eligibility and method of computation.
 
 III. OTHER DEFENSES AND RELATED ISSUES
 
 35
 Both the company and the union seek to escape back pay liability to the members of the "new" Ford class by way of certain affirmative defenses. Unlike the generalized pleas to equity which we dismissed earlier, however, these defenses to the extent they are valid either do not call for a blanket denial of back pay to all discriminatees, or else they merely entail equitable apportionment of eventual back pay responsibility as between the defendants.
 
 
 36
 The company relies on a mass of pretrial and post-trial exhibits which purportedly demonstrate significantly higher black, as opposed to white, rates of refusal to bid on entry-level jobs in the line of progression, voluntary freezing in lower jobs following advancement into the line, and waivers of promotional opportunities under the court-reformed seniority system. The company seeks to use this evidence primarily in an effort to block the class, or particular groups within it, from reaching the individualized back pay stage. This, we conclude, the exhibits cannot accomplish. Initially, there is at best only a tenuous logical connection between the failure of isolated blacks to promote and the issue of economic injury to the broader class of blacks on account of unlawful discrimination. Judge Pointer found that Fairfield's numerous forms and subforms of occupational, line, and departmental seniority operated to perpetuate the effects of the company's pre-Title VII active racial discrimination in hiring and initial assignments. The company does not question those findings on appeal. Additionally, we must recognize that victims of discrimination frequently hesitate to move into new jobs when, as at Fairfield, the price of mobility is loss of seniority earned in a former position. See United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 453, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972), where the black employee's dilemma is aptly described. Under a history in which blacks were hired into less-desirable jobs and remained behind their white contemporaries in terms of the kinds of seniority necessary for advancement to and security in the higher-paying jobs, the experience under a bidding system neutral on its face is not a persuasive indicator of the progress blacks would have made as a group but for seniority discrimination.
 
 
 37
 On the other hand, we do not wish to demean whatever evidentiary value the company might be able to extract from its exhibits in terms of class or subclass mitigation, as in Judge Pointer's method of awarding back pay among the members of the "original" Ford class. Nor do we intend to subtract from the probative value of any particular employee's declination of a promotional opportunity, either before or after the institution of reformed seniority. In either case it is more likely with the evidence than without it that the employee would have refused the promotion under any circumstances, in which event he should not receive damages for the wages waived. We simply note that these are questions to be considered by the district court on remand. The applicable burden-of-proof rules are those laid down in Johnson v. Goodyear and Baxter, supra.
 
 
 38
 In contrast to the company, the union does not rely so much upon factual arguments as upon a rather fragile theory of the law. Essentially, the union contends that any discrimination for which it may be responsible was the result of good faith efforts to comply with the law, undertaken in reliance upon earlier lower court and administrative decisions which had given positive treatment to similar seniority systems at other basic steel production facilities. Specifically, the union points to Whitfield v. United Steelworkers, 5 Cir. 1959, 263 F.2d 546; United States v. H. K. Porter Co., N.D.Ala.1968, 296 F.Supp. 40, 66-67, vacated with instructions, 5 Cir. 1974, 491 F.2d 1105; United States v. Bethlehem Steel Corp., W.D.N.Y.1970, 312 F.Supp. 977, modified and remanded, 2 Cir. 1971, 446 F.2d 652; Matter of Bethlehem Steel Corp. (Sparrows Point Plant), OFCC Dkt. 102-68, Dec. 18, 1970, rev'd by Sec'y of Labor, Jan. 15, 1973, EPD P 5128; and certain language in Local 189, United Papermakers v. United States, 5 Cir. 1969, 416 F.2d 980, 993, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). From these cases the union gleans respectable support for its contention that, at least until the Second Circuit's decision of June 21, 1971 in Bethlehem Steel, it appeared that the remedies of plant-service seniority and rate retention would not be applied to the steel industry due to the dangers and complexities of the steel manufacturing process. Moreover, when the Second Circuit issued its opinion in Bethlehem Steel, the district court decision in H. K. Porter was pending on appeal to this court, and remained on this court's docket for almost three more years, despite interim requests by the government and the union for this circuit's response to the issue of "rightful place" relief in the steel industry. Thus, the union insists that the defendants in this case reasonably relied on the prior decisions in maintaining and defending the Fairfield seniority systems, and that the prior decisions gave positive notice of a steel industry business necessity exemption from the remedies which were first ordered in the tobacco and paper industries. See Quarles v. Philip Morris Co., E.D.Va.1968, 279 F.Supp. 505; Local 189, supra. The union therefore asks us to exonerate it from potential back pay liability on grounds of "exceptional circumstances" or "substantial injustice."
 
 
 39
 The appellants characterize the union's theory of a "unique" steel industry litigation history as an elaborate appeal to the "unsettled state of the law" a theory which we have thoroughly rejected as a defense to back pay liability under both Title VII and Section 1981. See Johnson v. Goodyear, supra, 491 F.2d at 1377; Pettway, supra, 494 F.2d at 255 & n.132. Cf. Moody, supra, --- U.S. at --- & n.15, 95 S.Ct. at 2374 & n.15, 45 L.Ed.2d at 299 & n.15. Despite the union's lack of bad faith and Judge Pointer's finding that it "had good reason . . . at least in this circuit," 371 F.Supp. at 1062, to believe that the Fairfield seniority systems comported with the law, we believe that the appellants are fundamentally correct. As we stated in Johnson v. Goodyear, supra :
 
 
 40
 At least since July 2, 1965, the effective date of Title VII, the employers of this nation have been on notice that employment discrimination based on race, whether overt, covert, simple or complex, is illegal. In this case, the employer has been violating the Act as to some employees since that date. If we were to accept the employer's position the effective date would be advanced at least to the date of the Griggs (Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158) opinion. This result would be untenable and completely at odds with the Congressional purpose evidenced by enacting Title VII. Title VII is strong medicine and we refuse to vitiate its potency by glossing it with judicial limitations unwarranted by the strong remedial spirit of the act. (footnote omitted).
 
 
 41
 Accord, Pettway, supra, 494 F.2d at 255-56.
 
 
 42
 Title VII applies, of course, to unions which are parties to the collective bargaining agreement as well as to employers. See Johnson v. Goodyear, supra, at 1381; Carey v. Greyhound Bus Co., 5 Cir. 1974, 500 F.2d 1372, 1379. Both were placed on notice of the law at the same time. The gist of the union's argument, however reasonable it may appear depending on the orientation from which one reads the cases cited in support thereof, reduces to a contention that the defendants should not somehow be penalized for reliance on what turned out to be an erroneous view of the law. We dismissed a similar argument in the context of the public accommodations provisions of Title II of the 1964 Civil Rights Act, see Miller v. Amusement Enterprises, Inc., 5 Cir. 1970, 426 F.2d 534, 536: "(t)he actions of Fun Fair Park became subject to the prescribed judicial relief not because the Court said so, but rather because the Court said even perhaps for the very first time that the Congress said so." We reach the same conclusion here, without consideration of whether other cognizable "exceptional circumstances" or "substantial injustices" may exist apart from compliance with state protective statutes which have not been ruled inconsistent with Title VII. Cf. Moody, supra, --- U.S. at --- nn. 17, 18, 95 S.Ct. at 2374, nn. 17, 18, 45 L.Ed.2d at 299, 300 nn. 17, 18; Pettway, supra, 494 F.2d at 254; Johnson v. Goodyear, supra, 491 F.2d at 1377. See also Stevenson v. International Paper Co., supra, at 113-114 ("government (OFCC) imposed" discrimination at the plant involved in the lawsuit). The crux of the matter is that the defendants in this case took a particular legal position in litigation over the issue of their seniority system's legality. This was their right, but with it came the usual risks of litigation, including the risk of civil liability. The defendants' position failed them; the statute and the authoritative cases construing it provide for back pay in order to make the victors whole; and we decline to subvert that integral scheme with a crazy-quilt pattern of different back pay liability dates, industry-by-industry, plant-by-plant, on the basis of a few district court decisions, administrative panel rulings, and nonprecedential appellate language, all involving factual settings at places other than Fairfield Works. To embark upon such a course would entangle the compensatory, nonpenal purpose of back pay in a web of judicial gamesmanship.
 
 
 43
 Nevertheless, one legitimate defense of sorts remains available to the union with respect to back pay liability. In the three private class actions in which Judge Pointer awarded back pay below, the International was absolved of back pay responsibility because it "was not really responsible for the practices giving rise to the three back-pay awards." 371 F.Supp. at 1060 n.39. Instead, the court assessed the awards one-half against the company and one-half against the offending locals. On remand the parties are free to litigate these same issues in connection with any back pay which may be awarded in favor of the members of the "new" Ford class. The apportionment problem is initially one for the district judge, and we intimate no further view except to suggest that the court consider the matter in light of our recent cases. See Guerra v. Manchester Terminal Corp., 5 Cir. 1974, 498 F.2d 641, 655-56; Gamble v. Birmingham Southern R.R.,supra, 514 F.2d at 686-87; Johnson v. Goodyear, supra, 491 F.2d 1381-82, and any other relevant cases which the parties may bring to the district court's attention. The district court also should enter specific findings in support of its determinations of back pay responsibility.
 
 IV. CONCLUSION
 
 44
 We have given careful consideration to all other contentions on appeal and find them to be without merit.[1] For the reasons discussed heretofore the Craig appeal is dismissed. The decision of the district court denying back pay, which was brought forward by the Ford appeal, is vacated and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 For example, we note that the company's request for a trial by jury has been foreclosed in this circuit by Johnson v. Georgia Highway Express, supra, 417 F.2d at 1125. We are also aware that the company's alternative plea for recognition of substantial discretion in the district judge over whether to award back pay is supported by Justice Rehnquist's concurring opinion in Moody, supra, --- U.S. at ---, 95 S.Ct. at 2384-87, 45 L.Ed.2d at 312, 313. On the other hand, our cases, e. g., Pettway, supra, hold that the district court's discretion to deny back pay is "narrow." 494 F.2d at 252. The only "special circumstance" we have recognized is that of a conflicting state statute which required the employer to violate Title VII. See LeBlanc v. Southern Bell Tel. & Tel. Co., E.D.La.1971, 333 F.Supp. 602, aff'd per curiam, 5 Cir., 460 F.2d 1228, cert. denied, 409 U.S. 990, 93 S.Ct. 320, 34 L.Ed.2d 257 (1972). Moreover, this circuit has already extended the principle of Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 565-66, 51 S.Ct. 248, 251, 75 L.Ed. 544, 550 (1931), to Title VII back pay cases. ("Difficulty of ascertainment is no longer confused with right of recovery."). Johnson v. Goodyear, supra, 491 F.2d at 1380. As Mr. Justice Rehnquist observed in Moody, this principle's classic application has occurred in suits for money damages, in which the parties ordinarily are entitled to a jury trial. Thus, to reconcile this variety of competing tensions in the context of Title VII is no simple task. Yet we have endeavored conscientiously herein to follow the controlling precedents of this court and of the Supreme Court. In the absence of a material conflict between our decisions and the majority opinion in Moody, we are bound to do so. Though perhaps, as the union argues, some degree of conflict now exists, compare Moody, supra, --- U.S. at ---, 95 S.Ct. at 2371-72, 45 L.Ed.2d at 296-297, with Pettway, supra, 494 F.2d at 253, we believe that the inconsistency is superficial to this case. Our lawsuit is now well beyond the point at which the "reasonably certain prospect of a back pay award" operates as an incentive to voluntary compliance. Cf. Moody, supra, --- U.S. at ---, 95 S.Ct. at 2371, 45 L.Ed.2d at 296. Instead, we are concerned with back pay as "an equitable award for past economic injury." Pettway, supra (emphasis in original). From the standpoint of the compensatory purpose of back pay, which is at issue here, we perceive no conflict whatever between previous decisions of this court and the majority opinion in Moody