EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

MARTIN MARIETTA CORP.,
et al., Defendants.

No. 91–471–CIV–ORL–22.

United States District Court,
M.D. Florida.
Orlando Division.

March 3, 1993.

---

Stanley Kiszkiel, Angelo Filippi, Eve G. Lowe, Karen Khan, E.E.O.C. Miami, FL, Donald R. Livingston, E.E.O.C. Trial Services Div., Washington, DC, Carla J. Vogel, E.E.O.C. Miami, FL, Philip B. Sklover, E.E.O.C. Washington, DC, for plaintiff.

Thomas Chason Garwood, Jr., Garwood & McKenna, P.A., Orlando, FL, for defendant.

### ORDER

CONWAY, District Judge.

This cause is before the Court on the Report and Recommendation (Dkt. 40), filed January 3, 1993.

After an independent *de novo* review of the entire record in this matter, including the objections filed, the Court agrees entirely with the findings of fact and conclusions of law in the Report and Recommendation. Therefore, it is ORDERED as follows:

1. The Report and Recommendation (Dkt. 40) is adopted and confirmed and made part of this Order.

2. Plaintiff is entitled to back pay in the amount of $9,330.00. The parties are directed to meet within twenty (20) days of the date of this Order and discuss the appropriate form of future relief.

3. Plaintiff shall notify the Court in writing within twenty-five (25) days of the date of

this Order whether the parties were able to agree on appropriate future relief.

DONE AND ORDERED.

### *REPORT AND RECOMMENDATION*

BAKER, United States Magistrate Judge.

TO THE UNITED STATES DISTRICT COURT

## I. INTRODUCTION

Pursuant to Title VII of the Civil Rights Act of 1964, the United States Equal Employment Opportunity Commission ("EEOC") brought this action against Martin Marietta Corporation ("Martin") claiming that Georgia Rambo ("Rambo") had been unlawfully denied promotion to a supervisory position due to sex discrimination.

Pursuant to 42 U.S.C. § 2000e–5(f)(5), the presiding District Judge ordered the United States Magistrate Judge to conduct all further appropriate proceedings in the matter, including trial (Doc. No. 8). A five day trial was held November 4, 1992. Having heard the evidence and considered the written and oral arguments of counsel, the undersigned issues this Report and Recommendation of proposed findings of fact and appropriate disposition of the case.

## II. AGREED BACKGROUND FACTS

The parties are in agreement as to many jurisdictional and background facts. This action was filed by the EEOC pursuant to 42 U.S.C. §§ 2000e–5(f)(1) and (3). This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343, and 1345. Martin is subject to the requirements of Title VII pursuant to 42 U.S.C. §§ 2000e (b), (g), and (h). Disposition on the merits of Rambo's discrimination claim is therefore appropriate.

Rambo is female. Martin is a major federal defense contractor with extensive facilities in the Orlando area. Pertinent to this case is Martin's Electronics Prototype Laboratory ("EPL"). One part of the EPL consists of electronics technicians (and supervisors) who fabricate prototype units and provide other technical services for specified projects being developed by Martin. This electronics group within EPL operated two laboratories known, respectively, as the East and West Sides, based on their locations within the Orlando area.

These labs operated with a small number of technicians in the "Home" labs with many more technicians out on project or field sites. The supervisors were responsible for all of their technicians, regardless of location. The duties of and qualifications for supervisors was contested at trial and will be discussed below.

In 1988, economic conditions and personnel changes resulted in Martin reorganizing the supervisory structure of the electronics group of the EPL. Conrad Lammon had been the supervisor. Charlie Thomas was his assistant supervisor on the East Side, and Jim Day and Bob Biggs were West Side assistants.

When Lammon and Thomas retired at the end of 1988, upon Lammon's recommendation, Day was promoted to replace him as supervisor. Biggs was transferred to the East Side for six months, and C.J. Moore, a senior technician, was promoted to assistant supervisor. Moore worked on the West Side during a training period[1] and then transferred to the East Side, with Biggs moving back to the West Side permanently.

The net result of these changes was the elimination of one slot (on the West Side) which had been titled "assistant supervisor." Martin contends there were major changes in duties and qualifications for the supervisory personnel under the new arrangements.

Following Moore's designation for promotion, Rambo complained to Day that she should have gotten the promotion. Day reviewed her qualifications and adhered to his original decision. In January and February 1989, because of Rambo's complaints, others at Martin undertook to investigate and re-

---

1. The proper characterization of this period was debated at trial. Some of Martin's witnesses objected to the term "training." It is conceded, however, that the reason for relocating the more experienced Biggs temporarily was to allow Moore to work initially under closer supervision by Day. In its Trial Brief, Martin refers to this as "an initial training program."

view the promotion decision. These included Bruce Archibel, a personnel manager; Sharon Savage, an EEO administrator; Anna Toole, a human resources manager; and Charles Erd the over-all manager for EPL (and Day's immediate superior). All of these individuals directly or indirectly consulted with Day about the bases for the decision and ultimately concurred that Rambo was not qualified and had not been discriminated against. Except for Erd, none of these individuals was involved in Day's initial decision to select Moore.

Martin does not post job openings and does not use a formal application process to consider employees for promotion. No job description or list of qualifications or duties specific to this assistant supervisor position existed prior to Moore's selection.

Dissatisfied with Martin's decision, Rambo filed a formal complaint with EEOC. This litigation eventually followed.

### III. GOVERNING LAW

Beyond the beguiling simplicity of the statute,[2] the basic law applicable to this case is set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and their progeny.

■■■ The plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093. The plaintiff can meet this burden if she can show (1) she belongs to a protected group; (2) she applied for and was qualified for the promotion; (3) despite her qualifications, she was denied the promotion; and (4) a person outside the protected group was promoted. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 n. 7 (11th Cir.1983). If the plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for rejecting the plaintiff. *Id.* This is a burden of production. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. The defendant does not need to persuade the court that it was actually motivated by the proferred reasons. *Id.* at 254, 101 S.Ct. at 1094. Should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093.

Some of the leading Eleventh Circuit cases applying these principles in situations analogous to the case at bar are *Perryman*, 698 F.2d 1138; *Equal Employment Opportunity Commissions v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir.1991); and *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir.1985).

### IV. CONTENTIONS OF THE PARTIES AND EVIDENCE PRESENTED

Stated simply, EEOC contends that Rambo was groomed, trained and designated for promotion to the assistant supervisor's job. The EEOC argues that failure of the successor supervisor to promote her was discriminatory as shown by the invalidity of the reasons stated for the decision.

Martin contends that Rambo was not qualified for the promotion and that, even if she were qualified, the choice of a different candidate was proper business judgment based on changes in the job duties. According to Martin, after the restructuring of the EPL and elimination of one of the West Side assistant supervisor positions, both of the remaining assistant supervisors had expanded duties, including substantially greater responsibility to handle technical problems with project engineers, including testing and troubleshooting. Based on this characterization of the "new" job, Martin contends Moore was better qualified based on his greater experience working on projects, working in the field, and testing and troubleshooting.

---

**2.** 42 U.S.C. § 2000e–2(a)(1) provides: It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin.

The following is a list of the witnesses who testified, with a brief indication of the subject of their testimony. All of the witnesses are current or former Martin employees. Where appropriate, further reference to their testimony is made in the Proposed Findings of Fact, below.

1. Georgia Rambo (claimant)—testified regarding her experience and qualifications, including her supervisory training under Lammon; discussed events leading to and after Moore's promotion.

2. Mary Lou Brewer (technician)—testified to her uneasiness with Day as a supervisor and his general reputation.

3. Conrad Lammon (retired supervisor)—discussed supervision duties prior to his December 1989 retirement; testified to Rambo's qualifications; stated that *he* would have promoted her had he remained after Thomas's retirement.

4. C.J. Moore (assistant supervisor)—discussed his own qualifications and performance of duties since his promotion.

5. Charles Thomas (retired assistant supervisor)—testified to Rambo's qualifications and training and the duties of the assistant supervisor as he performed them prior to retirement in December, 1989.

6. Vicky Lawrence (technician)—testified regarding Day and Moore's duties; does not consider Rambo qualified to be assistant supervisor.

7. Charles Erd (EPL manager)—had discussions with Day re filling assistant supervisor position; relied on Day's opinions to conclude Rambo not qualified.

8. James Day (supervisor)—discussed job duties and qualifications; described selection process and review after Rambo's complaint; concluded Moore was highly qualified and Rambo unqualified; assistant supervisor job changed and became more technical after retirement of Lammon and Thomas.

9. Joan Kelly (compensation manager)—critiqued Plaintiff's damages calculation; illustrated range of salaries and possibility that promotion to exempt job status may reduce actual pay due to different overtime rules.

10. Dorothy Parsley (technician)—discussed Rambo's job performance and qualifications.

11. Kathy Lauer (technician)—discussed Rambo's job performance and qualifications.

12. Bruce Archibel (personnel manager)—described his investigation and review of Rambo's complaint; concluded she was not qualified to do job as described by Day or even be a Technician I, although she could do the job previously performed by Thomas.

13. Sharon Savage (EEO administrator)—also investigated Rambo's complaint and concluded she was not qualified; was not consulted during initial decision making.

14. Anna Toole (human resources)—discussed salary policies and review of investigations of Rambo's complaint done by others.

15. Robert Biggs (assistant supervisor)—described his job duties since 1989 as compared to earlier; concluded Rambo not qualified to be assistant supervisor.

The principal exhibits received in evidence were personnel files, job descriptions and damages calculation charts.

## V. PROPOSED FINDINGS OF FACT

### A. Prima Facie Case

In addition to the agreed jurisdictional and background facts set forth above, the following facts were proven by the evidence submitted.

■ Rambo was qualified for promotion to assistant supervisor. The evidence of the actual job duties and requirements was conflicting. Martin's witnesses stated repeatedly, but in conclusionary fashion, that the job became more sophisticated upon the retirement of Lammon and Thomas. The evidence of actual day to day activity by the assistant supervisors, before and after the reorganization, belies this conclusion.

Rather than rely on fixed job descriptions, the supervisors divided their duties in accordance with the characteristics of the various incumbents. Rambo was trained in virtually all of the duties actually performed or expected of an assistant supervisor and at

times performed most of those tasks herself in the absence of Thomas. Rambo had sufficient technical background and experience to perform supervisory duties.

The assistant supervisor job is primarily administrative, though familiarity with various technical aspects is required. Technical problems in the lab were usually handled by the engineer and not by the assistant supervisor. The assistant supervisor does not need to be able to perform every technical task herself. The assistant supervisor assigns jobs to technicians, assures that the necessary parts are available, handles the technicians' time cards, completes the paperwork for tool calibration and technician certification, is custodian of the Red Book, and interviews and evaluates technicians.

The two individuals, Lammon and Thomas, who had detailed close personal observation of Rambo's work, abilities and training, both considered her qualified for promotion to assistant supervisor. Rambo received formal job appraisals of "Outstanding" (Martin's highest rating) for the two years prior to the promotion opportunity.

Rambo demonstrated her continuing commitment to and interest in advancement by taking in-house electronics courses and seeking and obtaining supervisory training from her direct superiors.

Several witnesses offered their opinions that Rambo was not qualified for promotion. As to the supervisory and managerial personnel, this conclusion was based on Day's analysis of Rambo's qualifications and the requirements of the job. Without explanation, Martin failed to obtain relevant information from Lammon and Thomas, who had the best foundation for knowledge about Rambo's suitability for the job. The other technicians who expressed doubts[3] about Rambo's qualifications likewise lacked complete, firsthand information about her.

Based on the evidence of the actual duties performed by the assistant supervisors, both before and after Lammon's retirement, Rambo was qualified and able to perform those duties. There is no serious dispute that Rambo sought and was denied the position and that the position was filled by a person not within any class protected under Title VII. Thus, Plaintiff has presented a prima facie case of unlawful discrimination as prescribed in *McDonnell Douglas.*

### B. Reasons for Non–Promotion

■ Martin offered several non-discriminatory explanations for its decision: (1) Rambo was not qualified; (2) Moore was far better qualified; (3) the job duties were changed for economic and business reasons away from the skills possessed by Rambo; and (4) the objective review process assures against discriminatory decisions. Because the Defendant articulated these reasons, the burden of persuasion is with the Plaintiff to prove them false (*i.e.,* pretexts) or otherwise to prove unlawful discrimination.

The first point, Rambo's qualifications, has already been dealt with above. As to the second point, the evidence shows that Moore was qualified for promotion even though a six month training period was deemed appropriate before formal promotion and final assignment. The evidence does not show he was *more* qualified than Rambo. His experience and qualifications were *different* than Rambo's, stronger in some areas and weaker in others. Moore had more formal education, more field experience and more testing background. He was less familiar with the technicians on the East Side and their various skills. He had not performed or been trained in many of the administrative tasks essential to supervision.

Martin, in argument and conclusionary statements, emphasized the importance of the factors as to which Moore was superior and downplayed the significance of areas where Rambo was strong. Based on the *evidence* of relevant job performances, however, none of Moore's identifiable strong points was a controlling part of the job. Witness after witness concurred that the majority of the work was administrative. On a day-to-day basis, detailed technical problems are addressed by the project engineers, not supervisors of the technicians.

---

**3.** It should be noted, however, that evidence of lack of confidence in Rambo by her peers *is* relevant in assessing Rambo's overall qualifications.

The assistant supervisors spend very little time actually involved in the detailed work being performed by the technicians. Assuring that technicians maintain quality control, proper time accounting, tool calibration, safety standards, attendance, employee appraisals and job cost estimating are the mainstays of the assistant supervisor, not hands-on technical problem solving.

Martin emphasized Moore's experience as a "tester" of circuits but did not demonstrate that such testing was a significant part of the technicians' jobs, much less the supervisors'. There was no evidence to suggest Moore was better qualified to prepare employee appraisals or job cost estimates than Rambo.

Martin's emphasis of the points favoring Moore is an afterthought. The promotion decision was effectively made by Day in December 1988. Day did not rely on or prepare a written job description at that time. He testified that he reviewed personnel files for all of the technicians and a few engineers who might fill the bill.

In settling on Moore as his choice, Day did not discuss the "new" duties with him to see if Moore himself considered himself ready and able to undertake those tasks. This suggests that those items *now* identified as new and significant were not considered novel or highly important at the time the decision was made.

The evidence also shows that Day did not seriously consider Rambo as a candidate *before* making his selection and therefore did not in fact carefully compare her qualifications with Moore's until after the die had been cast. Sharon Savage, Martin's EEO administrator, testified that whenever a promotion involves an applicant who is a member of a group protected by Title VII, the EEO department is supposed to be notified so it can perform an independent review of the decision.

Day was trained in these EEO procedures but did not seek EEO review of this decision. Day had been told by Lammon that Rambo was interested in and qualified for the job. Had he seriously considered her, he would have sought EEO review and validation of his selection of Moore. His failure to do so demonstrates that, despite information from Lammon, Rambo was not given equal consideration.

Martin relies on review of Day's decision by his superior Charlie Erd. However, with respect to the initial decision, Erd testified that he considered only Moore and various others who were already in exempt (*i.e.*, supervisory or engineering) positions. His participation does not show that Rambo was fairly considered at the initial stage.

Martin also points to its objective review process in early 1989, undertaken in response to Rambo's objections. Each of those investigations and analyses suffer from *post hoc* analysis and reliance on a common source: Day's characterization of the job duties and his analysis of Rambo's background. These circumstances destroy the "independence" of the review process.

Bruce Archibel was brand new to his duties as a personnel manager in EPL. In his investigation of whether Rambo had been fairly considered, he never talked to Rambo herself or to her prior supervisors to find out her capability independently of Day's assessment. Archibel concluded that Rambo was not even qualified to be in the position she held at that time, much less a promotion. This conclusion is undercut by his having sought an alternative supervisory position for her and his concession that she was qualified to do the work previously performed by Thomas as assistant supervisor. His knowledge of "new" job requirements was based entirely on what Day told him.

The analysis by Savage was likewise skewed by faulty foundations. Savage relied on a job description (Defendant's Exhibit 2) to analyze Rambo's qualifications. That document does not reflect the duties of the supervisors of technicians; rather it is geared toward the engineering professionals, within the EPL, who are at the same salary grades. Obviously, when compared to the technical and professional descriptions for such positions, Rambo was found wanting. Savage also relied on Day without consulting Lammon or Thomas.

Martin's human resources manager, Anne Toole, also reviewed the decision but did not

delve beyond the characterizations noted above. In short, none of the objective reviewers got behind Day's justification which was predicated on his own *post hoc* identification of "new" job duties. There was in fact no independent, objective review of Day's decision.

As alluded to above, Martin's reliance on changes in job duties is unavailing. The evidence does not show any significant changes in the nature of the work performed by EPL supervisors. Variations that may have occurred are more the result of personal attributes of the new incumbents. This entry level supervisory position does not involve creative problem solving. As Robert Biggs, the other assistant supervisor, testified, the job became *more* administrative after Lammon left but otherwise was just more of the same thing as before Lammon's departure.

The reasons articulated by Martin for refusing to promote Rambo are not supported by and have been disproven by the evidence. Had Rambo been fairly considered along with Moore at the time of the initial decision, their roughly comparable (though not identical) qualifications would have permitted Martin to enjoy a significant degree of discretion in choosing between candidates.

However, the evident failure to give Rambo that initial fair shake undermines the customary allowance for business judgment. For a court to review a discretionary employment decision four years after the fact and to substitute an outside *legal* judgment for the *business and technical* decisions on which an enterprise must rely to prosper is, to a degree, a temerarious act. Nevertheless, the importance of our national aspirations (and laws) to end discrimination require no less.

The evidence in this case does not suggest any pattern of discrimination at Martin. On the other hand, the procedures used by Martin have gaps that allow individual unfair decisions to be made. At least as applied in this case, Martin had no definite or well established criteria to evaluate candidates for promotion. The lists of duties created after

the fact were vague and attitudinal. Even the objective factors listed are debatable because their importance to the actual job is a matter of degree and opinion. Martin did not appear to take into account the objective factors which it historically used to evaluate employees (*e.g.*, on the job training, taking of courses and annual evaluations). Martin assigned no weights to various factors at any time.

In this case, the decision makers failed to consult with those having relevant first-hand knowledge. Combined with the absence of job posting and a formal application process, these circumstances allow purely subjective judgment to control. Because there was no effective, timely and independent review of the decision, the peril of hidden discrimination is great.

Ordinarily, the business judgment exercised in choosing between two qualified (but not identical) candidates is for the employer. The common law does not require the decision to be rational nor does it guarantee success for those having greater merit.

However, when a candidate from one of the groups protected against discrimination under Title VII is rejected, evaluating the fairness of the decision includes examination of the rationality of the choice. Thus, the court is required to make a judgment as to job requirements and qualifications which would ordinarily be the sole province of the employer. Our economic system presumes that employers will make those decisions efficiently[4] in their own self-interest. Deference is thus due to an employer's business judgment. That deference, however, cannot be permitted to hide discrimination.

The Supreme Court in *Burdine* highlighted these principles:

> "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and ... neutral employment and personnel decisions." ... Title VII, however, does not demand that an employer give preferential treatment to

---

4. To the extent managerial decisions do not promote efficient production, profits and the enterprise will suffer commensurately.

minorities or women. The statute was not intended to "diminish traditional management prerogatives.... It does not require the employer to restructure his employment practices to maximize the number of minorities and women hired ... [T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination. 450 U.S. at 259 (citations omitted).

Giving appropriate effect to both of these fundamental policies creates a powerful tension which cannot be resolved by reference to a pat formula. Case law and commentators illustrate the myriad of situations in which the dilemma arises. Harmonizing these goals requires a rule of law which demands the appearance *and* reality of fairness in the exercise of business judgment. *See, e.g., Schlei & Grossman, Employment Discrimination Law*, Chapter 6 (2d ed. and supplements).

Application of these competing principles is particularly difficult in a case, such as this one, involving a single promotion sought by numerous qualified applicants[5]. In this situation, provided the employer actively and fairly considers the candidates on an equal basis, its choice among the qualified candidates should be deferred to in most instances. It is often difficult even to articulate compelling reasons for choosing a particular candidate. Moreover, no candidate is entitled to favoritism. Even a random choice from the group of qualified candidates would be lawful.

■ By contrast, where the employer fails to assure fair consideration of all qualified applicants (or articulates qualifications which do not truly fit the job), much closer scrutiny is required and less deference is accorded to the employer's decision.

■ The articulated and actual process and reasoning show that Rambo was not fairly considered as an initial matter and that the later expressed reasons for her rejection were pretextual. Under *McDonnell Douglas*, this means Rambo has demonstrated that she was unlawfully discriminated against even in the absence of direct proof of discrimination. This also means that Rambo is entitled to an award of back-pay. Rambo does not have to prove that she would have been promoted to establish her entitlement to back-pay. Her burden is met under *McDonnell Douglas* by showing that she was qualified for the promotion and discriminated against. *Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598, 602 (7th Cir.1979). Moreover, because Martin still refuses to acknowledge Rambo's qualifications, it did not prove that Rambo would not have gotten the promotion in the absence of discrimination *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

### C. Damages

The evidence as to damages is unsatisfactory. EEOC offered charts (Plaintiff's exhibits 30 and 30A) comparing Rambo's actual income with an approximation of Moore's salary as an assistant supervisor for the same time period. Using this comparison, EEOC calculated net lost back pay of $19,-199.28 and asks for interest of $4,679.36, for a total of $23,878.64.

Even ignoring the inherent speculation regarding the effects of intervening evaluations, this comparison would not appropriately serve as a "make-whole" remedy. Martin proved, without contradiction, that, had she been promoted, Rambo would not have started at the same salary that Moore received upon *his* promotion, based on his greater number of years as a senior technician.

---

5. In the usual termination situation, there is usually no direct comparison between competing employees (although comparative treatment may be an issue). The reasons for employment action are accordingly more direct and often less subtle. Where an employee shows he or she was terminated for discriminatory reasons, it can be inferred that employment would have continued absent the discrimination. Where a single promotion is made discriminatorily from a qualified group, it is far from clear that the victim would have gotten the promotion in any event.

Rambo would have been much closer to the bottom of the salary range for the position.

Martin's complex analysis of the raises Rambo would have received in the meantime (Defendant's exhibit 41A) is also fundamentally flawed. It assumes, for example, that Rambo's raises in 1990 and 1991 would have been based on the "3" evaluations she received continuing in her position as a technician. Because the evaluation score plays such a significant role in the amount of a raise, the result distorts materially what Rambo could have expected to earn as a supervisor. Under Martin's analysis Rambo would have received only $1,162.80 more as an assistant supervisor during the entire three and one half year period than she actually was paid as a technician.

Because of seniority and overtime pay, supervisors at Martin do not necessarily make more than the people they supervise. However, according to Toole, as a rule, individuals promoted to supervisory positions receive a 5% increase from prior salary along with any other merit increase (pro rated if necessary). Martin attempts to maintain a differential between supervisors and subordinates at 10% but sometimes experiences compression.

Damages must be the reasonably certain result of unlawful conduct and when computing damages, unrealistic exactitude is not required and uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer. *United States v. United States Steel Corp.,* 520 F.2d 1043, 1050 (5th Cir.1975). With these requirements in mind and recognizing the artificiality of any hypothetical comparison between Rambo's actual income and her lost opportunity, it is reasonable to allow her a 7.5% differential above her actual income. This represents an average of the raise she would have received and Martin's goal of 10%. Because this calculation is a hypothetical construct, further refinement by adding interest is not appropriate (or may be deemed included in the calculation).

Rambo's total income from May 1989 to the end of 1992 is approximately $124,400. Back pay equal to 7.5% of this total ($9,330)

should be awarded. In addition, Martin should be required to provide future affirmative relief to Rambo to place her in the same position she would enjoy had there been no discrimination. Given Rambo's transfer to a different part of Martin and the dramatic changes in Martin's work force and operations since 1988, it is unclear what form of future relief is appropriate, fair and realistic. The parties should be given the opportunity to agree on the form of relief, failing which they can each make a further submission to the Court.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days of the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended this 4th day of January, 1993.